Glenn D. BARTLE, Trustee of Markson Bros., Inc., now known as M B H, Inc., Plaintiff,

v.

Asher S. MARKSON, Defendant.

No. 65 Civil 78.

United States District Court
N. D. New York.

May 23, 1969.

Smith, Sovik, Terry, Kendrick, McAuliffe & Schwarzer, Syracuse, N. Y., for plaintiff, Laurence Sovik, Syracuse, N. Y., of counsel.

Mackay & Caswell, Syracuse, N. Y., for defendant, William J. Mackay, Syracuse, N. Y., of counsel.

## DECISION

RYAN, District Judge.

This action came to me for trial during my designation to sit in the Northern District of New York. Trial had been had before the late Judge Brennan, decision had been reserved, briefs had been submitted and the issues were being considered by the Judge, when he died. The attorneys for both parties stipulated that I might sit as trial judge and render decision on the trial record already made. I have read the trial transcript, exhibits, and briefs, and have heard counsel in oral argument. I am grateful to the attorneys for their assistance. It is but one of many occasions when, confronted with a situation testing the efficiency of our judicial system, members of the Bar recognize the responsibility we all share and give complete cooperation to the Court.

This opinion shall constitute my findings of fact and conclusions of law.

The action arises out of the sale of all of the capital stock of Markson Bros., Inc. (the corporation), a retailer of furniture and house furnishings which operated a chain of stores, to Son-Mark Industries, Inc. (Son-Mark) on November 6, 1959 for $1,350,000.00 and the subsequent bankruptcies of both the corporation and Son-Mark.

Plaintiff, Glenn D. Bartle, as Trustee in Bankruptcy of the corporation now known as M B H, Inc., filed this action on February 18, 1965, one day after his election as Trustee.

The corporation on March 31, 1961 filed a petition for arrangement under Chapter XI of the Bankruptcy Act in this District and a Plan of Arrangement to pay general creditors 47½% in cash, but objections were made on the ground that defendant and other officers and directors had failed to explain shrinkage in assets of $1,964,794. The plan was confirmed by the Referee and by the District Court, but the confirmation was reversed by the Court of Appeals which remanded the matter to require that inquiry be made into the lost assets, the Court stating (314 F.2d 303, 306, March 5, 1963):

"Here Markson's sudden and unexplained riches-to-rags descent from its position as one of the financially strongest concerns in the central New York area to that of a bankrupt company amply makes out the *prima facie* case required by the statute to shift the burden to Markson to explain the loss of nearly $2 million in a loan to its corporate parent—whose assumption of control of the debtor marked the start of the subsidiary's financial decline."

Following that decision, the creditors discovered that the assets of the corporation had been transferred to Solways Furniture Co. in December, 1961. In settlement of their claim that this was illegal, the Referee on October 28, 1963 approved a compromise providing for payment to all the creditors of an additional 25% on the balance of their claims and reserving to the creditors all causes of action against the officers, directors, and stockholders of the corporation. At that date, a class action was pending on behalf of all creditors in the New York State Supreme Court against the defendant; a second class action was commenced shortly thereafter by another creditor against the corporation, Son-Mark and officers and direc-

tors other than Asher S. Markson. When defendant challenged the use of the class action device and contended that each creditor must establish his individual claim, certain creditors moved this Court to reopen the Chapter XI proceedings and to appoint a Receiver to represent all the creditors. Judge Brennan on March 3, 1964 granted the relief sought, and the Receiver so appointed, after being denied intervention in the State Court, filed an action against defendant in this Court in April, 1964. The complaint was dismissed by Judge Brennan for lack of capacity to sue, and on appeal to the Court of Appeals, Second Circuit, the dismissal was affirmed (340 F.2d 30, 1965). The Court held that there was no basis to support prosecution of creditors' claims by a Receiver appointed under Chapter XI of the Bankruptcy Act, particularly where there were no assets and where all rights had been reserved to the creditors, and thus gaining admission to the federal courts, but that it did not consider "whether some alternative procedure might render a federal forum available * * *." (p. 33).

It was following this decision that, at a meeting of creditors called on February 17, 1965 by the Referee, the plaintiff Bartle was elected Trustee and filed this action the next day. On May 18, 1965, summary judgment was granted on defendant's motion dismissing the complaint for lack of capacity to sue in the Trustee. From the appeal which followed, the Court held (357 F.2d 517, 1966) that the District Court had federal jurisdiction to entertain this action under Section 70(e) of the Bankruptcy Act which declares that the Trustee can avoid any transfer of property that is fraudulent or voidable under any Federal or State law applicable thereto.

It read the complaint to alleged conveyances condemned as fraudulent by Sections 273–276 of the New York Debtor and Creditor Law, McKinney's Consol.Laws, c. 12, and transfers of corporate property violating Section 15 of the Stock Corporation Law, McKinney's

Consol.Laws, c. 59. It noted that the complaint did not sufficiently charge a preference avoidable under Section 60 of the Bankruptcy Act in that it lacked any allegation of a debtor-creditor relationship between the corporation and Son-Mark; and that it stated a very questionable claim under Section 67 of the Bankruptcy Act for most of the transactions alleged, even if within the definition of fraudulent conveyances, had not occurred within a year prior to the filing of the petition as Section 67 requires. However, the Court found that, although the suit was against Markson and not Son-Mark, the transferee, it was maintainable and there was a basis for jurisdiction under Section 70(e):

> "To the extent that Markson has received the benefit of a conveyance allegedly fraudulent against creditors, he is the proper defendant in a suit to avoid the transfer and § 70(e) is applicable even on the most literal reading." (p. 522)

With respect to the other transactions charging Markson with having consented to or caused a fraudulent transfer (General Corporation Law, McKinney's Consol.Laws, c. 23, Sec. 60(1) and (2)) rather than with having received its fruits, the Court sustained jurisdiction under the pendent jurisdiction doctrine, since the transfer of corporate assets to Son-Mark, and thence to Markson, was "the source from which all else flowed" (522).

The following are the statutory provisions relevant to plaintiff's claims.

Section 70(e) (1) of the Bankruptcy Act provides that a transfer which, under any federal or state law applicable thereto, is fraudulent as against, or voidable for any other reason by any creditor of the debtor "shall be null and void against the trustee of such debtor."

Section 15 of the New York Stock Corporation Law prohibits the transfer of property by any corporation which shall have refused to pay any of its obligations to any of its officers, directors

or stockholders other than for "the full value of the property paid in cash."

Section 60(1) and (2) of the General Corporation Law authorizes an action against any director or officer to compel the payment to the corporation or its creditors of the value of any property acquired to themselves, or transferred to others, or lost, or wasted, by or through any neglect of or failure to perform or other violation of their duties.

Section 273 of the Debtor and Creditor Law of New York declares as fraudulent every conveyance made and every obligation incurred by a person "who is or will be thereby rendered insolvent, if made or incurred without a fair consideration." Sections 275 and 276 declare fraudulent as to present and future creditors every conveyance made and every obligation incurred without fair consideration when the party believes or actually intends that he will incur debts beyond his ability to pay as they mature. Section 278(1) (a) allows a creditor to set aside a fraudulent conveyance to the extent needed to satisfy his claim.

Plaintiff claims that the proof entitles him to judgment for the following three items:

1. $310,723 with interest from March 31, 1961 for the shortage resulting from the mingling of the funds of Son-Mark (less $70,000 paid out of said funds to purchase "Household Outfitting Co." or $240,723.97).

2. $205,114 with interest from March 31, 1961 paid by Markson Bros. to Son-Mark out of the funds so comingled between June 30, 1960 and March 31, 1961.

3. $25,000 with interest from April 11, 1960 paid by Markson Bros. to Eastern Brokerage Company for a debt of Son-Mark.

I find that the evidence establishes the following:

For many years prior to November 6, 1959, defendant was president and a director of the corporation and in active charge of the management and supervision of its business and affairs. At said time, defendant was individually or beneficially interested in 709 shares and his relatives owned the balance of the 1418 shares of capital stock of the corporation issued and outstanding.

In June, 1959, defendant negotiated for the sale of all of the capital stock of the corporation with Abe Goldman, Albert D. Dukow and others—all relatives of defendant—for $1,350,000 to Son-Mark Industries, a corporation formed by the purchasers—all relatives of defendant. The negotiations were reduced to writing under date of October 22, 1959 and the sale was consummated on November 6, 1959. At the time of the closing and for many years prior, the corporation had had a rating with Dun & Bradstreet of AAA–1.

To finance the purchase of the stock, Son-Mark borrowed $1,350,000 from Heller & Co., a lending institution, and to repay this loan, it "borrowed" cash from Markson as follows: $80,000 cash on hand, $300,000 United States Government Bonds, $56,000 cash value of life insurance policies, $250,000 from the proceeds of the sale of real estate. In addition, the corporation pledged to Heller accounts receivable worth $1,-100,000 for the sum of $639,000. This $639,000 was later paid off on March 28, 1960 by a loan which Markson took from Redisco Company, because Son-Mark was dissatisfied with the interest it was paying Heller, in the amount of $985,464 in exchange for an assignment to Redisco of all its accounts receivable. The loans from Redisco eventually grew into $1,970,320. Son-Mark borrowed $25,000 from Eastern Brokerage Co., a company owned by Goldman and the other directors of Son-Mark, which loan was repaid by Markson on April 11, 1960. Substantially all the assets of the corporation were liquidated to finance the purchase of its stock by Son-Mark. In exchange, Son-Mark issued to the corporation 20-year unsecured subordinated debentures in the sum of $1,409,000 which had no fair market value.

Defendant, his accountant of many years and his attorney, Goldman and Dukow (officers of the purchaser), and a representative of Heller were all in the room at the time when the sale of the stock was consummated and the loan from Heller to Son-Mark simultaneously paid off.

Upon the sale of the stock of the corporation to Son-Mark, defendant on November 5, 1959 resigned as an officer and director of the corporation and thereupon Goldman and Dukow, officers of the purchaser, became officers and directors of the corporation. However, defendant continued as an officer to assist in the management of the stores, with authority to sign checks without countersignatures for the corporation and its subsidiaries. On December 30, 1959, defendant told Goldman he would again like to be president of the corporation and, on that date, resumed the office of president of the corporation, as well as a director of both Son-Mark and the corporation. He continued in both capacities to about March 13, 1961 and received a salary of $400 per week.

At all times from about November 6, 1959 through March 31, 1961, Goldman and Dukow, officers and directors of Markson, owned or controlled all of the stock of Son-Mark and Son-Mark owned all of the stock of the corporation.

As a result of the transfer, the corporation's assets were depleted and its capital impaired, but it continued to carry on its regular business incurring obligations, without giving any official notice to its creditors, present and future, other than an announcement in the paper that the stock had been transferred to Son-Mark but that the business of the corporation would continue under the same management.

Beginning in January, 1960, with the knowledge and consent of defendant, all of the receipts from the operation of the business of the corporation, totalling $1,329,039.42, were deposited in accounts in the name of the corporation or its subsidiaries in various banks, and then withdrawn by checks payable to Son-Mark and deposited in bank accounts of Son-Mark and mingled with its other funds. Out of the funds so mingled, Son-Mark paid certain obligations of the corporation and the remainder thereof Son-Mark appropriated and used for its own use and benefit and that of its officers and directors, and not for the use and benefit of the corporation or its creditors. However, $70,000 was expended to purchase Household Outfitting Co. which became an asset of the corporation. Defendant personally signed 15 checks totalling $154,036.28 on bank accounts of the corporation, payable to Son-Mark. The difference between what Son-Mark received from the corporation and what was paid out by Son-Mark on behalf of the corporation as of March 31, 1961, was $240,723.97. Said $240,723.97 was used by Son-Mark in its business and that of its many other subsidiaries. No record or transcript was ever sent to defendant by Son-Mark, nor did defendant make any request for such record or transcript, pertaining to the expenditure of the funds turned over to Son-Mark by the corporation, or to Son-Mark's financial condition.

As of June 30, 1960, there was recorded on the books and record of the corporation under Current Liabilities, an item "Due to Son-Mark Industries, Inc. $205,114.81." Said item was alleged to be for "unpaid home office and supervision charges, $111,964.72" and "net cash advances, $93,150.09." Between June 30, 1960 and March 31, 1961, said $205,114.81 was paid to Son-Mark by the corporation. The "home office and supervision charges" set up on the books and records of the corporation were not bona fide home office and supervision charges and were set up as such charges for tax "gimmicks" and "washouts" of interest accruals on the worthless debentures owing by Son-Mark to the corporation and as a "means to get money into Son-Mark."

On April 11, 1960, the corporation paid to Eastern Brokerage Company the

sum of $25,000 as a "loan receivable". Eastern Brokerage was controlled by Goldman and the other directors of Son-Mark. This was the $25,000 referred to above which was loaned to Son-Mark by Eastern Brokerage in order to pay for the stock of Markson on November 6, 1959, and was included in the $1,350,000 purchase price. This too, was recorded on the books of the corporation.

Defendant negotiated the "sale" of the corporate assets to Son-Mark and was present at the closing; he had been and continued to be the president of the corporation. For many years, he had been a director of the Merchants National Bank, had acted on the bank's loan committee and had examined balance sheets. He testified that, although he was president of the corporation with authority to sign checks on behalf of the corporation and its subsidiaries, which he did, and a director of Son-Mark, between November, 1959, and March, 1961, he saw but one balance sheet of the corporation in June, 1960, at which time he saw listed the $1,409,000 unsecured debentures of Son-Mark; obligations of the corporation to Son-Mark to the extent of $205,000 for "supervision fees"; that all the corporation's accounts receivables had been discounted for the loan from Redisco; that the cash on hand in November, 1959 was no longer there but had, in fact, been overdrawn by $28,461; and that it no longer had the $300,000 United States Government Bonds. He also saw that the liabilities of the corporation had jumped from $131,739 as of January 31, 1959 to $1,584,934. It was his testimony that, in the face of all these obvious indicia that the corporation had been stripped and continued to be stripped of its assets and accounts and unable to pay its bills, he made no inquiry whatsoever. It was also his testimony that, in spite of the fact that he knew in November, 1960 and on through 1961 that the invoices to the corporation were not being paid and that the creditors were demanding payment, he continued sending the corporation checks to Son-Mark without questioning Son-Mark's condition or its use of the corporation's money.

Defendant's personal involvement and callous indifference to his fiduciary obligations, and the profit resulting to him, is attested to by his testimony that, at the closing when he received as "agent" the check of Son-Mark in payment of the stock of which he owned shares, he never inquired into the capitalization of Son-Mark because he was being paid in cash; that "where the cash came from or who the company was that were paying for it was of no concern"; and that he did not make any inquiries along those lines, for, so long as he was being paid in cash, "it was of no concern to investigate further."

There were creditors filing claims in the proceeding who were creditors at the time of the payment of said $240,723.97 by the corporation to Son-Mark; who were creditors at the time of the payment of said $111,964.72 by the corporation to Son-Mark; who were creditors at the time of the payment of said $93,150.09 by the corporation to Son-Mark; and who were creditors at the time of the payment of said $25,000 by the corporation for Son-Mark.

The payments from the funds of the corporation of $240,723.97, $205,114.81 and $25,000 were made when the corporation was insolvent, or its insolvency was imminent, and were without fair consideration.

It has been stipulated that the general unsecured creditors of the corporation consisted of 438 creditors with claims totalling $505,661.99 in amounts as finally allowed in the bankruptcy. (This includes claims of creditors of Household Outfitting Company, amounting to $129,640.76 whose claims have been paid on the basis of 47½% plus 25%.)

Considering all of the evidence, I find that, beginning with the sale in 1959 to the filing of the petition, there was an overall plan in which defendant participated for the benefit of Son-Mark and himself to transfer assets of the corpor-

ation in order to finance the purchase of its stock by Son-Mark, thus causing the assets of the corporation to be depleted; that the transfer on November 6, 1959 of assets of the corporation was without fair consideration and fraudulent as to existing and as to future creditors; and that, after the acquisition of control by Son-Mark, there was an improper course of conduct further to deplete the assets of the corporation for the benefit of defendant and Son-Mark by the three subsequent transactions relied on by plaintiff, whereby the corporation's funds were syphoned off to Son-Mark.

I conclude that defendant was personally involved in this fraudulent course of conduct both by reason of his actual and knowing participation in the transfers and the position of trust he occupied with respect to the corporation. The evidence shows that, in the face of obvious and irregular withdrawals from the corporation's bank accounts, he made no inquiry although charged with the obligation and right to do so as to those transactions in which he did not personally participate. As to those in which he did participate by signing checks or approving them, he clearly violated his duty of trust to the corporation. I also find that he was fully aware of the details of the transfer of the cash assets of the corporation at the time of the sale of its stock to Son-Mark and that he knew that this sale was not for the benefit of the corporation—because it presently depleted its assets and would render it insolvent and unable to meet its obligations as they accrued.

It has been determined by the Court of Appeals that the jurisdiction of this Court is grounded on Section 70e of the Bankruptcy Act and that the plaintiff sues on behalf of the creditors of the corporation for acts declared illegal under the New York Debtor Creditor Law, the Stock Corporation Law and General Corporation Law.

I find that the evidence sustains a finding that:

1. The initial transfer of assets to Son-Mark in November, 1959 under the guise of a loan in exchange for worthless debentures and the three subsequent payments of the corporation's funds to Son-Mark were in violation of Section 60(1) and (2) of the General Corporation Law and in fraud of the corporation's creditors irrespective of its insolvency at the particular times. It was clearly a breach of defendant's fiduciary duty as a president and director of the corporation to permit the stripping of the corporation's assets, as it was a beach of his duty to commingle or permit the commingling of the corporate funds with those of its principal stockholder Son-Mark for the latter's benefit, and to cause and permit the diversion of its funds to the uses of Son-Mark. Defendant's violation of this duty with respect to the corporation was the source from which sprang the subsequent wrongful transfers.

2. The payment of the $25,000 loan to Eastern on behalf of Son-Mark, with the knowledge and consent of defendant, without consideration from Son-Mark at a time when the corporation had been stripped of its assets and when its accounts had begun to be diverted and commingled with Son-Mark's, was an act done with knowledge that it would contribute to or hasten the insolvency of the corporation which was rapidly approaching, thus making it difficult, if not impossible, for it to pay its obligations. The evidence establishes that there were creditors of the corporation at this time, April 1960; that by October, 1960 the corporation was unable to pay its accounts and that its creditors were complaining. This was a violation of Sections 274 and 275 of the Debtor and Creditor Law.

The balance sheet of the corporation as of June 30, 1960 lists under "Current Assets" the $25,000 paid to Eastern as a "loan receivable", when, in fact, it was paid out as a debt. Also under "Invested Assets" is listed the 8% debentures valued at $1,409,000.00. The balance sheet is accompanied by a note, which is

an integral part of the balance sheet, reciting that the value of the debentures is stated at cost and that their current value can be determined only by current appraisals. No such appraisal was ever made. It is not disputed that the debentures were worthless. Consequently, if there is subtracted that amount and the $25,000 Eastern item, the balance sheet reveals a deficit of $1,434,500 and liabilities exceeding its assets by that amount. The balance sheet shows total current liabilities of $1,584,934.35, whereas on the date of the sale of the assets to Son-Mark they were stated as $131,739.88.

3. The payment of $205,114.81 to Son-Mark out of the commingled funds of the corporation from June 30, 1960 to March, 1961 were made without consideration when insolvency was threatened and after it had become a fact. They were in violation of Section 15 of the Stock Corporation Law and in violation of Sections 273, 274, 275 and 276 of the Debtor and Creditor Law.

4. The payments totalling $240,723 to Son-Mark over the period from January, 1960 to March, 1961 were also made when defendant knew that insolvency would follow, and in some instances after it had developed, and were in violation of Section 15 of the Stock Corporation Law and Sections 274, 275 and 276 of the Debtor-Creditor Law.

■■ I find and conclude that the action is not time barred. It was instituted the day after the Trustee qualified to recover damages for waste of corporate assets and the six-year statute is applicable (CPLR 213, subd. 8). (Buckley Petroleum Prod., Inc. v. Goldman, 28 A. D.2d 640, 280 N.Y.S.2d 876 (A.D.4, 1967).)

■■ The creditors of Household Outfitting are entitled to share in the recovery of assets by the Trustee against defendant. No separate petition was filed on their behalf in the Bankruptcy Court; their assets and liabilities were lumped with those of the corporation and its subsidiaries in the plan of arrangement. Their claims were considered and allowed by the Referee as those of the creditors of the corporation. That disposition is res judicata as to defendant who never appealed from the Referee's treatment of those creditors and who participated in the proceedings and accepted 15% on his debentures. The allowance or disallowance of a claim in bankruptcy proceedings has the same effect as a court judgment (3 Collier on Bankruptcy 14th Ed., p. 221; United States v. American Surety Co. of New York, 56 F.2d 734 (C.A.2d, 1932)).

The three items on which I hold the Trustee entitled to recover total $470,-837.97. It has been stipulated that, after crediting the payments of the 47½% and 25% dividends, the total unpaid amount of unsecured creditors' claims is $199,104.41.

The question is whether plaintiff is entitled to recover the entire amount of the funds illegally diverted from the corporation as a judgment here or whether his recovery is to be limited to the amount of creditors' claims only. Judge Friendly, in upholding the right of the plaintiff to maintain this suit, held that upon the reopening of the estate the debtor in possession (the corporation) had been replaced by the Trustee, who was empowered to act as the representative of the creditors, and that the sole purpose of the reopening of the estate was to prosecute claims against officers or directors of the debtor which are "the debtor's only remaining asset" (citing Section 44(a), Bankruptcy Act), the prosecution of which the defendant had made well nigh impossible.

The purpose of permitting the reopening of the estate was to find out what had happened to "the loss of nearly $2,-000,000." (340 F.2d 30, 31); and, I add, to pursue any available and appropriate remedies to recover it. Plaintiff contends that, under the language of the Court of Appeals, it is arguable that the Trustee qua debtor in possession may recover all its assets, leaving to the Bankruptcy Court the distribution among the creditors and disposition of

any surplus. It is plain, however, that the Court of Appeals simply upheld the jurisdiction of the District Court to entertain the complaint, and held that plaintiff's right to recover depended on the State statutes pleaded. I have found that plaintiff may recover under the Debtor and Creditor Law, the Stock Corporation Law, and the General Corporation Law. The Appellate Division, in Buckley Petroleum Prod., Inc. v. Goldman, 28 A.D.2d 640, 280 N.Y.S.2d 876 (A.D.4, 1967), the class action brought by the creditors against this defendant, held that "the creditors have causes of action only to the extent to which they have been damaged. Debtor and Creditor Law, § 278(1) (a) allows a creditor whose claim has matured the right to set aside a conveyance only to the extent needed to satisfy his claim. * * * Although Stock Corporation Law, § 15 reads so as to make any payments prohibited by the section void, the concluding sentence makes the personal liability of officers and directors limited to 'the full extent of any loss' to creditors insofar as an action by creditors is concerned (see Shaw v. Jewel Radio Corp., 6 A.D.2d 707, 708, 174 N.Y.S.2d 315, 318). General Corporation Law, § 60(2) also limits the creditors to their losses as opposed to allowing them a general role as a righter of wrongs to the corporation (see generally New York Credit Men's Adj. Bur. v. Weiss, 305 N. Y. 1, 110 N.E.2d 397; affg., 278 App. Div. 501, 105 N.Y.S.2d 604). Thus, insofar as the action is one by creditors, recovery must be restricted to the amount of all legitimate creditors' calims less 47½% realized through the bankruptcy and less the $84,762.13 paid the creditors by the successor to Markson Bros. The granting of the trustee's motion to amend the prayer for relief to allow him to recover all that he is entitled to as trustee does not give him a right to recover an amount in excess of the damages sustained by the creditors. Here he is acting solely on behalf of creditors and recovery of their losses can be accomplished only upon proof of

their respective causes of action." (pp. 878–879) Accordingly, that State Court denied plaintiff trustee's motion to strike defendant's affirmative defense that he was entitled to be credited with the payments on the claims of the general creditors in accordance with the arrangement approved by the Bankruptcy Court.

This interpretation by the New York Appellate Court of these State statutes is binding on this Court. The statutory right of the plaintiff may not be enlarged by any equitable or practical considerations of the Bankruptcy Court. See, however, Collier on Bankruptcy, Vol. 4, p. 1796, to the effect that the Trustee's amount of recovery in the Trial Court in a Section 70(e) suit should not be limited by the claims of creditors in the Bankruptcy Court because "it would be generally impracticable for the Trial Court to determine the many factors that enter into the potential distribution." Here, I have no such problem. The estate was completely liquidated and was reopened for the limited purpose of insuring effective prosecution of creditors' claims. The unpaid amount of the claims has been stipulated. It is practicable to limit the recovery to the unpaid amount of the allowed claims, excluding Markson and the holders of the subordinate debentures.

■■ I have found that the defendant was personally involved in the fraudulent transfers of the corporate property to Son-Mark; that they were to his benefit; that he not only failed to give the creditors notice of this but actually misled them into thinking that business was continuing as usual; that he personally transferred and permitted transfers of cash collections of the corporation to Son-Mark, knowing that creditors were demanding payment and could not be paid; and that this conduct amounted to a violation of Section 276 of the Debtor-Creditor Law in that it was engaged in with "actual intent" to defraud and hinder present and future creditors. Plaintiff is, therefore, enti-

tled to recover counsel fees (Section 276–a Debtor and Creditor Law; Glenmore Distillieries Co. v. Seideman, 267 F.Supp. 915 (1967).

The parties are directed to settle a judgment on five days' notice to be entered against the defendant Asher S. Markson in the amount of $199,104.-41 with interest at 6% from the date of the filing of this suit with taxable costs and disbursements, and providing for a hearing as to the amount to be allowed plaintiff for his attorneys' fees.