**DEAN WITTER & CO., INC.**

v.

**EDUCATIONAL COMPUTER CORPORA-TION (PA.), Defendant.**

**EDP TECHNOLOGY, INC. and Educational Computer Corporation (Del.), Defendants and Third-Party Plaintiffs,**

v.

**Doris B. BARON et al., Third-Party Defendants.**

Civ. A. No. 69–1250.

United States District Court,
E. D. Pennsylvania.

Jan. 23, 1974.

Paul L. Donnelly, Philadelphia, Pa., for Dean Witter & Co.

Maurice Pollon, Philadelphia, Pa., for Educational Computer Corp. of Pa.

Richard R. Rulon, Philadelphia, Pa., for EDP Tech. Inc. and Educational Computer Corp. of Del.

## OPINION

GORBEY, District Judge.

This is an action by a broker against the issuer of corporate stock to obtain transfer of certain legended stock certificates and damages for the issuer's delay or refusal to transfer the shares. Before this court is a motion by the issuer's successor for summary judgment. The issuer has refused transfer because the broker's customer had previously obtained the transfer of the same stock by providing the issuer with an affidavit stating that these shares had been lost. For the reasons which follow, the motion is granted.

The motion for summary judgment is based upon the following uncontested facts.

On April 5, 1968, Gilbert B. Rozran (Rozran) placed an order to sell 500 shares of Educational Computer Corporation, a Pennsylvania corporation (ECC of Pa.), stock with Robert G. Snider, an account executive in the San Diego, California office of Dean Witter & Co., Inc. (Dean Witter).[1] The sell order was executed by Dean Witter on the same day, at a total price of approximately $16,100.[2] At the time of the sale, no

---

1. Deposition, Robert G. Snider, pp. 22–25.   2. Snider, pp. 25–26.

stock of ECC of Pa. was in Rozran's account with Dean Witter.[3]

On April 15, 1968, Rozran delivered to Dean Witter, Certificate No. 17, issued by North American Electronic Systems, Inc., in the name of Corrine N. Levesque.[4] Shortly thereafter, Dean Witter received an instrument entitled, "Use of Certificate Registered in Name Other Than That of the Customer", executed by Corrine N. Levesque, authorizing Rozran to sell the securities of North American Electronic Systems, Inc., in the name of the said Corrine N. Levesque.[5]

On or about April 19, 1968, Rozran delivered to Dean Witter Certificate No. 6, issued by North American Electronic Systems, Inc., dated July 7, 1967, and requested that Dean Witter return Certificate No. 17 to him. Certificate No. 6 was issued in the name of Gilbert B. Rozran. Unknown to Dean Witter, an affidavit was executed by Rozran, wherein he acknowledged the sale of Certificate No. 6 to Doris B. Baron, and stated that since July 7, 1967, the Certificate could not be found and was otherwise lost, mislaid or destroyed.[6] Upon receipt by North American Electronic Systems, Inc. of the evidence of the sale of 5,000 shares of stock of that company, and the request of Mrs. Baron, that company caused the transfer of 5,000 shares from Rozran to Doris B. Baron to be registered. It issued a replacement Certificate (No. 16) to Mrs. Baron, in place of the lost Certificate No. 6.

Shortly thereafter, North American Electronic Systems, Inc. notified its transfer agent, Franklin National Bank, that Certificate No. 6 had been lost, and instructed Franklin National Bank not to honor any request for the transfer or exchange of the shares represented by Certificate No. 6.[7]

Certificate No. 6 had the following typed on its face: "ISSUED SUBJECT TO PROVISIONS ON REVERSE SIDE HEREOF". On the reverse side of the Certificate, the following language appeared:

> "By accepting within Certificate, for Systems Operations Support, Inc., the holder hereof, Dr. Gilbert B. Rozran, President, does hereby appoint Doris B. Baron as proxy to vote the shares represented hereby at the shareholders' meeting to be held September 16, 1967 with the knowledge and approval that Doris B. Baron intends to vote for the adoption of corporate amendments to be proposed at said meeting and on such other business as may come before the meeting; and it is further stated that the within shares were obtained as a charitable contribution to SOS, Inc., a non-profit corporation, per release by Doris B. Baron, with no present intention of resale and without reliance or any solicitation, advertisements, dealers or agents." [8]

Since the Certificate gave no indication that it covered stock of ECC of Pa., Rozran gave Dean Witter a prospectus

---

3. Snider, p. 22.

4. Snider, pp. 27–29; Deposition, Jacqueline Jobe, p. 17.

5. Snider, p. 30.

6. Certificate No. 6 had been issued by North American Electronic Systems, Inc. to Gilbert B. Rozran, pursuant to the transfer of 5,000 shares of common stock of that company, owned by Doris B. Baron, on or about July 7, 1967. At some time thereafter, Rozran entered into a written agreement whereby in consideration of the sum of $250 paid to him by Doris B. Baron, he sold, transferred and delivered all of his rights, title and interest to the 5,000 shares of common stock of North American Electronic Systems, Inc., represented by Certificate No. 6 back to Doris B. Baron. Rozran directed North American Electronic Systems, Inc. to transfer the shares from his name to the name of Doris B. Baron, or her nominee, and agreed to deliver Certificate No. 6, properly endorsed, to Doris B. Baron, or to the corporation. Shortly thereafter, Rozran advised Doris B. Baron that he had lost or mislaid Certificate No. 6.

7. Affidavit of Maurice Pollon, Esquire.

8. Affidavit of Maurice Pollon and defendant's exhibit no. 6.

of ECC of Pa., covering a public offering of its stock in March, 1968—a month before Rozran's attempted sale.[9] This prospectus, dated March 7, 1968, issued by ECC of Pa., stated on the front page thereof: "Prior to this offering, there had been no public market for the Company's Common Stock." It was made clear in the prospectus that the company had not previously registered any shares with the Securities and Exchange Commission. The prospectus was given to Dean Witter's employees for the purported purpose of providing information regarding the stock in question and was retained and used by Dean Witter to verify the change of company name from North American Electronic Systems, Inc. to ECC of Pa., and the exchange ratio of these shares.[10] Although the prospectus stated that the change of name and reclassification of shares were effective on September 22, 1967, Rozran's sale in April, 1968, was accompanied by the delivery to Dean Witter of certificates bearing the name of the previous issuer.

Rozran's request to exchange Certificate No. 6 for Certificate No. 17 was highly unusual.[11] Moreover, a legend like that on Certificate No. 6 would necessarily mean to a broker, such as Dean Witter, that the stock's transfer was subject to an "investment legend";[12] and that the Certificate was not in "good deliverable form".[13] On June 3, 1968, more than a month and a half after the receipt of Certificate No. 6, Dean Witter forwarded that Certificate to ECC of Pa.'s transfer agent, Franklin National Bank, with the request that the transfer agent issue a Certificate in the name of Dean Witter, in the amount of 500 shares, and a Certificate in the name of Gilbert B. Rozran, in the amount of 750 shares.[14] This was Dean Witter's first contact with ECC of Pa.'s transfer agent.[15]

The transactions in question all took place in a period of extreme activity in the securities markets. During this period, certain stock exchanges were closed one day a week, and closed earlier on the days they were open. Trading volume on the New York Stock Exchange in excess of twenty million shares was not unusual and the transfer functions (i. e., back offices), were in arrears. This condition existed throughout the entire industry until the second quarter of 1969.

On June 10, 1968, the transfer agent advised Dean Witter in writing that Certificate No. 6 had been replaced against an affidavit of loss, executed and delivered to ECC of Pa. by Rozran.[16] Franklin National Bank further advised Dean Witter that it had been instructed by ECC of Pa. not to effect any transfer of any shares represented by Certificate No. 6.[17]

In order to cover the sale of the 500 shares of ECC of Pa. stock sold on April 5, 1968, Dean Witter made a demand on Rozran that he deliver to it, 500 valid, transferrable shares of ECC of Pa. stock, but Rozran failed to do so.[18] Consequently, Dean Witter purchased 500

9. Jobe, pp. 23–24; Snider, pp. 30–33.

10. Jobe, pp. 23–24; Snider, pp. 30–33. The ECC of Pa. prospectus, attached as exhibit C to the Pollon affidavit, indicates that the September, 1967, recapitalization effected an exchange of the 1,000,000 outstanding shares of no par common stock for 250,000 shares of $.10 par common stock, i. e. the equivalent of a 4:1 reverse split. (See footnote 1 to Financial Statement—Prospectus, p. 16.)

11. Jobe, p. 21.

12. Jobe, p. 28; Deposition, John D. Armstrong, p. 28; Deposition, Laurence S. Kutt, p. 21.

13. Jobe, p. 29; Snider, p. 40; Armstrong, p. 26; Kutt, p. 17.

14. Snider, exhibit D–1.

15. Plaintiff's response to defendant's request for admissions.

16. Jobe, p. 58; plaintiff's answer to defendant's interrogatory no. 31.

17. Plaintiff's answer to defendant's interrogatory no. 31.

18. Snider, exhibit D–15c.

shares of stock in the open market. It made that purchase on or about June 29, 1968, at a price of approximately $69,000.[19]

The plaintiff's claim that it is entitled to have the Certificate transferred is founded in § 8–401 of the Uniform Commercial Code.[20] The relevant portion reads in part, as follows:

"§ 8–401 Duty of Issuer to Register Transfer

(1) Where a security in registered form is presented to the issuer with a request to register transfer, the issuer is under a duty to register the transfer as requested if

\*   \*   \*   \*   \*   \*

(c) the issuer has no duty to inquire into adverse claims or has discharged any such duty   .   .   . and

\*   \*   \*   \*   \*   \*

(e) the transfer is in fact rightful or is to a bona fide purchaser."

■ Looking first at subparagraph (c), this provision exempts the issuer from the duty to transfer where he has a duty to inquire into an adverse claim. Clearly, the fact that the shares in question have previously been transferred, gives the issuer notice of an adverse claim.[21] Subparagraph (c), however, does not exempt the issuer from the duty to transfer such shares when it has notice of an adverse claim. The purpose of this provision is to provide the issuer with an opportunity to notify the adverse claimant so that he may seek direction from a court concerning the issuer's obligation to transfer or obtain a guarantee of indemnity for improper registration in the form of a surety

bond. This was made clear by Kanton v. United States Plastics, Inc., 248 F. Supp. 353, at 361 (D.C.N.J.1965), which stated:

"If there is an adverse claim, the issuer is under a duty to make inquiry concerning such claim if written notification thereof is received at a time and in the manner which affords the issuer an opportunity to act on it prior to the issuance of a new certificate. This duty of inquiry may be discharged by the issuer by any reasonable means, including notification by mail to the adverse claimant that the security has been presented for registration, and that the transfer will be registered, unless within thirty days from the date of mailing the notification, either an appropriate restraining order issues from a court of competent jurisdiction or an indemnity bond is filed with the issuer sufficient in amount to protect the issuer from any loss or damage it may sustain by reason of compliance with the adverse claim. After this duty of inquiry is discharged, it then becomes mandatory under the Code, N.J.S.A. 12(A):8–401, for the issuer to register the transfer."

[*See also* § 8–403(2).] ECC of Pa.'s refusal on June 10, 1968, to effect transfer of the shares in question was in accordance with UCC § 8–401(1)(c).

■ Subparagraph (c), however, does not justify the continuing refusal to transfer the shares. Notice of an adverse claim to the stock sought to be transferred is a reasonable ground for temporarily refusing to register the transfer. O'Neil v. Wolcott Mining Co.,

---

19. Snider, pp. 83, 84.

20. Enacted in Pennsylvania April 6, 1953 P. L. 3, re-enacted October 2, 1959 P.L. 1023 (12A P.S. § 1–101 et seq.). In this opinion references will be to the Uniform Commercial Code section numbers.

21. In its brief, the plaintiff asserts, "neither Doris Baron (to whom the shares represented by the certificate were transferred) nor any other person is an adverse claimant.

This is purely a matter of involving the rights of Dean Witter as against the issuer." It is difficult to understand the plaintiff's rationale for such an assertion. Obviously, the res at issue is not the certificate which the plaintiff seeks to have transferred, but the rights represented by such a certificate. Since these rights were previously transferred to Doris Baron, her claim to such rights must be adverse to that of the plaintiff.

174 F. 527 (8th Cir. 1909). Whether ECC of Pa. was under a duty to transfer after having received such assurance is governed by § 8–401(1)(e), which requires transfer if: "the transfer is in fact rightful or is to a bona fide purchaser."

■ The Code does not provide a definition of the term "rightful". However, the plain meaning of the term must exclude the creation of a situation where two parties each receive a 100% interest in the same res or the establishment of a right, to an issuer's detriment (i. e., the requirement that the corporation issue additional stock, paying dividends thereon, etc.), for the purpose of perfecting the fraudulent scheme of a stockholder who sells the same shares twice. Accordingly, we hold that the transfer of stock, which was previously transferred pursuant to an affidavit of loss, would not be rightful.[22]

The fact that the transfer was not rightful does not exempt ECC of Pa. from the duty to register the transfer, since subparagraph (e) requires a transfer if it "is in fact rightful *or* is to a bona fide purchaser". The use of the disjunctive conjunction will permit recovery upon either condition. The issuer will be forced to bear a loss which would be otherwise unjust only because the superior interest of a bona fide purchaser intervenes. Therefore Dean Witter's right to compel registration is determined by its ability to prove itself a bona fide purchaser.

■■ In like manner, Dean Witter's right to recover damages is determined by whether or not it can establish itself as a bona fide purchaser. The plaintiff points to the fact that it had no knowledge of the previous sale of the shares and refers us to § 8–202(2)(a) to establish its right to damages. Specifically,

it points to the use of the term "*particular* defect" in § 8–202 and comment no. 1 to § 8–301. That comment reads:

"1. This article views the concept of negotiability from two aspects: issuer's defenses and adverse claims. Any purchaser for value of a security without notices of a particular defect may take free of the issuer's defense based on that defect, but only a purchaser taking by a formally perfect transfer, for value and without notice of any adverse claim, may take free of adverse claims. The 'bona fide purchaser' here dealt with is the person taking free of adverse claims. His rights against the issuer are determined by Part 2 of this Article and his rights to registration are determined by Part 4."

This note, however, must be read in conjunction with § 8–202(2)(a), the other place in the Code using the term "particular defect". That section reads in relevant part as follows:

"§ 8–202 Issuer's Responsibility and Defenses; Notice of Defect or Defense.

\*    \*    \*    \*    \*    \*

(2)(a) A security  .  .  .  even though issued with a defect going to its validity is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of constitutional provisions in which case the security is valid in the hands of a subsequent purchaser for value and without notice of the defect."

Comments 2, 3, 4 and 5 to § 8–202 indicate that subsection 2(a) is not relevant to the case *sub judice*. This subsection is concerned with "defects" rather than "defenses". It is intended to give of persons taking from the company on

---

**22.** The defendant has also argued that the transfer of stock with a legend such as the one in question would not be rightful because it could possibly violate certain provisions of the Securities Act of 1933. The plaintiff, however, argues that only actual violations of the Act should be controlling, rather than possibilities. Since we have decided that this transfer would not be rightful for other reasons, we need not examine these contentions.

original issue and later purchasers the broadest possible protection against defects in securities which would effect their validity.[23] Such defects are those contemplated by comment 4 to § 8–202 which reads:

> "4. Many jurisdictions have constitutional and statutory requirements that unless substantial value is received by the issuer for the security it shall be void. This Article follows the better case law and validates securities in the hands of bona fide purchasers where the provisions are statutory and bona fide subsequent purchasers where the provisions are constitutional, even when this type of defect exists. . . ."

Since the reason advanced by ECC of Pa. for refusing to transfer the securities was not a "defect" of this nature, but was the fact that the same security had previously been sold, § 8–202(2)(a) is not applicable.

Rather, this case is governed by § 8–202(4) which reads:

> "(4) All other defenses of the issuer including nondelivery and conditional delivery of a security are ineffective against a purchaser for value who has taken without notice of the particular defense."

This subsection deals with "defenses", as opposed to defects. It contains a similar provision, which requires notice of the "particular defense". However, the plaintiff's reference to § 8–202 is premature. Section 8–202 does not deal with the right of a purchaser to recover; it deals with the defenses which an issuer may assert against such a purchaser. It is necessary for the plaintiff to first establish the basis for its claim before deciding what defenses may be raised against it.

The plaintiff's rights are determined by § 8–301, which sets forth the rights acquired by purchase. It reads in part as follows:

> "§ 8–301 Rights Acquired by Purchaser; 'Adverse Claim'; Title Acquired by Bona Fide Purchaser.
>
> (1) Upon delivery of a security the purchaser acquires the rights in the security which its transferor had or had actual authority to convey except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who has as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser. . . .
>
> (2) A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim."

Subsection (1) gives the transferee the same rights as his transferor (as well as stating the shelter provisions and its exceptions). If Dean Witter seeks to assert its claim under § 8–301, subsection (1), that claim must be defeated.

Dean Witter acquired the security from Rozran. If its rights in the security are only those which its transferor had, ECC of Pa. would be able to assert the defense that Certificate No. 6 had already been transferred. It is quite obvious that Rozran could not use § 8–202(4) to preclude ECC of Pa. from asserting this defense. Rozran's affidavit which states: "On July 7, 1967, this deponent did sell, transfer and assign said Certificate No. 6 and the shares represented thereby to Doris Baron, who is the lawful owner of said certificate and the shares represented thereby", makes it clear that Rozran had "notice of the particular defense". Accordingly, § 8–202(4) would not assist Rozran, or any

23. Comment 2 to § 8–202 states:
    "2. By subsection (2) a security 'is valid' in the hands of a purchaser for value without notice of a particular defect even if the defect is so serious as to be described as one 'going to the validity' of the security. The few exceptions to this proposition are noted later. Notice that the 'purchaser' includes a person taking from the company on original issue (§ 1–201) whereas a 'subsequent purchaser' does not (§ 8–102)."

transferee acquiring his rights, in establishing his right to recover.

██ If Dean Witter is to recover, it must establish its claim as a bona fide purchaser under § 8–301(2). As a bona fide purchaser, it could look to § 8–202(4) to cut off the defense of previous transfer by establishing that it had no notice of that previous transfer (i. e., the particular defense). Therefore the right of Dean Witter to recover damages, like its right to have the transfer effected, is also determined by whether it can establish itself as a bona fide purchaser.

Section 8–302 defines a bona fide purchaser as:

" . . . a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security . . . in registered form . . . endorsed to him or in blank."

It is the defendant's contention that Dean Witter had notice of an adverse claim. An "adverse claim" is defined in § 8–301(1) as follows:

" 'Adverse claim' includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security."

It is uncontested that plaintiff Dean Witter did not know of the prior sale by its transferor, Rozran. Therefore Dean Witter would not know that a particular adverse person claimed to be the owner of the security. However, the definition of an adverse claim is not limited to claims that an adverse person is the owner; it also includes a "claim that a transfer . . . would be wrongful." Comment 4 to § 8–301 further clarifies the definition of an adverse claim. It reads:

"4. An adverse claim may be either legal or equitable, e. g. that [the security] . . . is proposed to be transferred in breach of trust or a valid restriction on transfer."

It is the defendant's position that the legend on the certificate in question gave the plaintiff notice of a claim that the transfer would be in violation of a valid restriction on transfer (i. e., in violation of the registration requirements of the 1933 Securities Act), thus making it wrongful.

Depositions of Dean Witter's own employees establish that had they observed this legend, it would have given them notice of such a claim. Jacqueline Jobe, cashier in Dean Witter's San Diego office, which received the certificate in question, testified at a deposition that the statement in question on the certificate suggests an investment legend.[24] Upon receipt of a certificate with such a legend, it would be noted on the receipt, and it would be called to the attention of someone like Mr. Kutt.[25] Laurence S. Kutt, head cashier of the plaintiff's Los Angeles office, and supervisor of the cashiers in the branch offices, testified in his deposition that "the certificate in question was not in good deliverable form" and that certificates which were not in good deliverable form would have to be cleared with the transfer agent.[26] Similarly, the deposition of John D. Armstrong, manager of Dean Witter's San Diego office, indicates that a legend, such as the one present on the certificate in question, should have been brought to the attention of the compliance department in Los Angeles.[27] The only conclusion which may be drawn from this testimony, which is uncontradicted, is that the legend was sufficient to state a claim that the transfer was subject to a valid [28] restriction.

24. Jobe, p. 28.

25. Jobe, p. 29.

26. Kutt, p. 16.

27. Armstrong, p. 28.

28. *See generally* Kenler, et al. v. Canal National Bank, U.S. Court of Appeals, First Circuit, 489 F.2d 482 1973 (CCH Fed.Sec. Law Rep. ¶ 94,917) and Riskin v. National Computer Analysts, Inc., 62 Misc.2d 605, 308 N.Y.S.2d 985 (1970), where the Court considered what must be done to obtain transfer of shares bearing a legend that they were issued for investment purposes.

Nor does the contention that the plaintiff's employees failed to observe the legend, assist it in establishing its claim. The Code imputes notice when a restriction is "noted conspicuously on the security" § 8–204. The certificate in question has a typewritten legend (in underscored, capital letters) on its face which makes it sufficiently conspicuous to charge a purchaser with the duty to observe it. Therefore Dean Witter cannot be said to have been without notice of an adverse claim which prevents it from being a bona fide purchaser.

As explained previously Dean Witter's inability to establish its status as a bona fide purchaser precludes its claims for relief under the Code.

█ The plaintiff also urges this court that denying it relief would not be equitable. The court is aware of the equitable dilemma posed to it when two relatively innocent parties have both dealt with a dishonest third party and one of the former must bear the loss. The plaintiff properly points out that the defendant ECC of Pa. could have avoided the losses at issue by requiring a surety bond as a condition to transferring Rozran's lost shares. This transaction, however, took place on or about October 3, 1967.[29] At that time, no public market existed for the company shares.[30] The absence of a public market would remove the requirement that the issuer obtain protection from a surety bond. Further, the original certificate which was issued had been legended, which would give notice to a prospective purchaser that it was not transferrable.

The plaintiff points out that it failed to observe the legend because of the nature of the securities markets at the time it was transferred. The court recognizes that this transaction was made during a period when brokerage firms were experiencing exceptionally high volume as well as their concomitant profits. A broker's decision to accept more business than it can properly transact should not serve as a basis for charging another party with losses which result from this manner of doing business. Had the plaintiff followed its own procedures for the receipt of legended stock, it too could have prevented the loss.

One other factor played a significant part in causing this loss—the plaintiff executed the sell order for Rozran on April 5, 1968, at which time his account was credited with the selling price of approximately $16,100. The certificate in question was not presented to the defendant's transfer agent until June 3, 1968, approximately two months after the sale took place. On June 10, 1968, approximately one week later, the transfer agent notified the plaintiff it would not effect transfer. By the time the plaintiff made a purchase on the open market on June 29, 1968 to cover the sale, the price was approximately $69,000. Again, in determining how such loss could have been avoided or reduced, the delay by the plaintiff in obtaining the certificate from its customer and presenting it for transfer cannot be overlooked.

We conclude therefore that the results obtained from the Uniform Commercial Code do not conflict with the equities in this matter. Accordingly, summary judgment for the defendant and against the plaintiff will be granted.

29. Rozran affidavit.

30. The initial public offering was not made until March 7, 1968; see Prospectus of ECC of Pa.