Graham C. GARNER and Sydney Morris, as Official Liquidators of the British-American Bank, Ltd. (in Compulsory Liquidation), Plaintiffs,

v.

Tazwell W. PEARSON, Donald R. Baker, Robert N. Bussey, and Exchange Bancorporation, Inc., Defendants.

No. 72–416 Civ. T–K.

United States District Court,
M. D. Florida,
Tampa Division.

March 15, 1982.

On Proposed Judgment June 30, 1982.

On Reconsideration July 23, 1982.

Preston Moore, Holland & Knight, Tampa, Fla., for Exchange Bancorporation.

Michael L. Kinney, Tampa, Fla., for Taxwell W. Pearson and Donald R. Baker.

Albert I. Gordon, Tampa, Fla., for Robert N. Bussey.

John L. Riley, St. Petersburg, Fla., for Frank J. Valdes.

James A. Dixon, Jr., Miami, Fla., Brian J. Gallagher, Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for plaintiffs.

## ORDER CONTAINING MEMORANDUM OPINION

KRENTZMAN, Chief Judge.

After hearing on plaintiffs' motion for partial summary judgment in the above cause the Court, by order entered September 15, 1981, granted the motion, directed counsel for plaintiffs to furnish and serve proposed findings or memorandum of opinion consistent with Rule 52(a), Federal Rules of Civil Procedure, and granted defendants time to file objections to the same.

After requests for extension of time were granted from time to time to the respective parties, the following were filed on the

dates indicated and are before the Court for consideration:

October 30, 1981—Plaintiffs' Proposed Memorandum of Opinion;

November 30, 1981—Defendant Exchange Bancorporation Inc.'s Objections to the Proposed Opinion;

November 30, 1981—Defendant Exchange's Suggestion of Lack of Subject Matter Jurisdiction;

December 1, 1981—Defendant Exchange's Motion for Rehearing on Summary Judgment Motion;

December 1, 1981—Defendants Pearson and Baker's Adoption of Exchange's Objections;

December 4, 1981—Defendant Bussey's Adoption of Exchange's Objections and Motion for Rehearing;

February 10, 1982—Plaintiffs' Memorandum Opposing Defendants' Suggestion of Lack of Subject Matter Jurisdiction;

February 17, 1982—Exchange's Reply to Plaintiffs' Opposition to Exchange's Motion for Rehearing;

February 18, 1982—Exchange's Reply to Plaintiffs' Memorandum Opposing Exchange's Suggestion to a Lack of Subject Matter Jurisdiction;

March 3, 1982—Plaintiffs' Response to Defendants' Request; and

March 12, 1982—Plaintiffs' Supplemental Memorandum Opposing Defendants' Suggestion of a Lack of Subject Matter Jurisdiction.

The Court has considered all of the above, finds that the respective objections to the proposed memorandum of opinion should be denied and overruled, that the respective motions for rehearing and lack of subject matter jurisdiction should be denied and it

is so ordered. The Court further finds that the proposed memorandum of opinion as hereinafter set out is consistent with the Court's order of September 15, 1981, and it should be and is adopted and confirmed in all respects.

## MEMORANDUM OF OPINION

### Introduction

The British-American Bank, Limited (the "B–A Bank"), was a Bahamian bank until 1972 when it was placed in compulsory liquidation by the Supreme Court of the Bahamas.[1] Plaintiffs are its court-appointed liquidators.

Plaintiffs brought this action to recover B–A Bank assets which they allege were misappropriated or otherwise unlawfully taken in violation of both statutory and common law by those who controlled the B–A Bank prior to its liquidation.[2] Plaintiffs claim that defendants Robert N. Bussey ("Bussey"), Tazwell W. Pearson ("Pearson") and Donald R. Baker ("Baker") controlled the B–A Bank and its subsidiary corporations, owed fiduciary duties to the B–A Bank and its depositors, but breached those duties by converting, otherwise misappropriating, or wasting various assets of the B–A Bank under circumstances which also violated the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)).

Defendant Exchange Bancorporation Inc. ("Exchange") is charged with being the transferee of one of these converted B–A Bank assets—35,079.34 shares (or 88%) of the common stock of the Citizens Bank of Clermont (the "Citizens Bank Stock"). Plaintiffs charge that Exchange purchased the Citizens Bank Stock from Bussey, Pearson and Baker with prior actual notice of an

---

1. On February 4, 1972, the Bahamas Ministry of Finance suspended the B–A Bank's banking license; on May 4, 1972, that license was revoked. On May 11, 1972, the Supreme Court of the Bahamas placed the B–A Bank in Provisional Liquidation pursuant to the Bahamas Companies Act and appointed Bernard Gadd Provisional Liquidator. On June 5, 1972, the Bahamas Supreme Court placed the B–A Bank in Compulsory Liquidation and appointed Mr. Gadd Official Liquidator. On March 30, 1973,

the Bahamas Supreme Court appointed plaintiffs to succeed Mr. Gadd upon his resignation.

2. For the prior background of this case, see the opinions in *Gadd v. Pearson*, 351 F.Supp. 895 (M.D.Fla.1972); *Garner v. Pearson*, 374 F.Supp. 580 (M.D.Fla.1973); and *Garner v. Pearson*, 374 F.Supp. 591 (M.D.Fla.1974). *See also, Garner v. First Nat'l City Bank*, 465 F.Supp. 372 (S.D.N.Y.1979), a related case.

adverse claim by the B–A Bank to that stock. On this footing, plaintiffs contend that Exchange's title to the Citizens Bank Stock is no better than that of Bussey, Pearson and Baker—a converter's title.

*The pending motion for partial summary judgment.*

Following the close of discovery, plaintiffs moved for partial summary judgment against Bussey, Pearson and Baker and Exchange with respect to the Citizens Bank Stock.

The parties provided complete briefs, and submitted affidavits, exhibits and admissions. All parties were fully heard at a lengthy hearing held on June 22, 1981. Following a review of the parties' detailed submissions and the arguments presented at the June 22, 1981 hearing, this Court issued its September 15, 1981 Order granting plaintiffs' motion for partial summary judgment against defendants Bussey, Pearson, Baker and Exchange.

*The record supports summary disposition.*

■ Summary judgment is required when the uncontradicted facts presented by the movant and his opponent establish a *prima facie* case which would support a directed verdict if uncontroverted at trial. *S.E.C. v. Spence & Green Chemical Co.,* 612 F.2d 896, 901–902 (5th Cir. 1980), *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981); *Walter E. Heller and Co. v. O/S. Sonny V,* 595 F.2d 968, 975 (5th Cir. 1979); *Munoz v. Int'l Alliance, etc.,* 563 F.2d 205, 212–214 (5th Cir. 1977); *Curl v. IBM Corp.,* 517 F.2d 212, 214 (5th Cir. 1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Golden Oil Co., Inc. v. Exxon Co., U.S.A.,* 543 F.2d 548, 551 (5th Cir. 1976); *Lovable Co. v. Honeywell, Inc.,* 431 F.2d 668, 670–671 (5th Cir. 1970); *Gould v. Control Laser Corp.,* 462 F.Supp. 685, 693 (M.D.Fla.1978), *modified,* 650 F.2d 617 (5th Cir. 1981).

A properly founded summary judgment motion requires proof which is "positive, direct and factual in nature ... not mere charges or assertions or conclusions." *Bros, Inc. v. W. E. Grace Mfg. Co.,* 261 F.2d 428, 432 (5th Cir. 1958).

■ Such a motion can be successfully resisted only by a showing that a trial is necessary to resolve a *genuine* issue (*i.e.,* one "that requires a judge or jury to resolve the parties' differing versions of truth at trial") which exists with respect to a *material* fact (*i.e.,* one "which is determinative of the parties' duties or rights"). *Valadez v. Graham,* 474 F.Supp. 149, 154 (M.D.Fla. 1979). "[T]he adversary [must] adequately demonstrate by receivable facts that a real, not formal, controversy exists, and, of course, he does not do that by mere denial or holding back evidence." *Bruce Construction Corp. v. United States,* 242 F.2d 873, 875 (5th Cir. 1957). *See Southern Rambler Sales Inc. v. American Motors Corp.,* 375 F.2d 932, 937 (5th Cir. 1967); Wright & Miller, *Federal Practice & Procedure: Civil* § 2727, pp. 536–537 (1973), *quoted with approval in Walter E. Heller & Co. v. O/S. Sonny V, supra,* 595 F.2d at 975. In order to create a "genuine" issue of fact, "more than mere allegations or conclusory statements must be offered." *United Steelworkers, etc. v. University of Alabama,* 599 F.2d 56, 61 (5th Cir. 1979). *See also Echaide v. Confederation of Canada Life Ins.,* 459 F.2d 1377, 1381 (5th Cir. 1972). And, it is not sufficient to suggest the possibility that inferences might be drawn at trial in the opponent's favor. A properly supported summary judgment can be defeated only by a showing that reasonable inferences from established facts could be drawn which would warrant a finding against the movant on a material issue. *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1117 (5th Cir. 1979); *Tyler v. Vickery,* 517 F.2d 1089, 1094 (5th Cir. 1975), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2660, 49 L.Ed.2d 393 (1976).

In this case plaintiffs put forward admissions, and documents which, taken together with the defense submissions of fact, establish the following facts:

(1) At all material times, Bussey, Pearson and Baker were control persons of the B–A Bank and the entire British-American corporate complex, including British-American

Holdings S.A. (the "B–A Fund"), British American Bancorporation Inc. ("B–A Bancorp"), the American National Bank and Trust Company of South Pasadena, Florida (the "American Bank"), and, after its purchase, the Citizens Bank of Clermont (the "Citizens Bank").

(2) The B–A Bank always owned a majority, and in October, 1971 it owned all but six, of the 405,608 issued and outstanding shares of the B–A Fund.

(3) The B–A Fund owned B–A Bancorp which had acquired 73% of the issued and outstanding stock of the American Bank with money supplied by the B–A Bank.

(4) Bussey, Pearson and Baker caused the B–A Bank to provide the funds used by Bussey and Pearson to purchase the Citizens Bank Stock in 1970.

(5) On January 9, 1970, Bussey and Pearson appear to have entered into a written agreement with B–A Bancorp[3] (the "B–A Bancorp Agreement"). That agreement permitted Bussey and Pearson to purchase the Citizens Bank Stock and register title in their personal names only until the Federal Reserve Board should approve B–A Bancorp's ownership of that stock, and required them to turn the stock over to B–A Bancorp upon such approval or dispose of the stock if approval were to be denied. The Bancorp Agreement placed the entire financial burden, and all benefits, of this transaction on B–A Bancorp.

(6) Bussey and Pearson registered the Citizens Bank Stock in their personal names, presumably pending regulatory approval of the ownership of that stock by B–A Bancorp.

(7) The Federal Reserve Board refused to approve the B–A Bancorp's proposed ownership of the Citizens Bank Stock and pressed Bussey to divest that stock during the fall of 1971.

(8) On October 25, 1971, Bussey, Pearson and Baker caused the B–A Bank to transfer all of its stock in the B–A Fund to the B–A Fund itself. They caused the B–A Fund to pay for these shares by: (a) issuing an unsecured, non-amortizing twenty-year note for $3 million from the B–A Fund to the B–A Bank; (b) returning the stock of Britton Plaza, Inc. ("Britton Plaza") to the B–A Bank at a stated value of $2 million[4] (Britton Plaza was a Florida shopping center which the B–A Bank had purchased in 1968 and transferred to the B–A Fund in 1969 in exchange for B–A Fund shares valued at $950,000); and (c) returning the stock of Killarney, Ltd. ("Killarney") to the B–A Bank at a stated value of $1.8 million. (Killarney was the Nassau Pepsi Cola bottler which Pearson had purchased on October 21, 1971, four days earlier, for $765,000, paid by the B–A Bank.)

(9) After October 25, 1971, Bussey, Pearson and Baker continued to control the B–A Fund.

(10) On October 25, 1971, Pearson also caused all of the issued and outstanding shares of the B–A Bank to be transferred to Dr. Federico Cruz ("Cruz"). Cruz purported to pay for these shares by delivering his $3.8 million promissory note to the B–A Bank.

(11) On December 23, 1971, Bussey and Baker[5] personally contracted to sell the Citizens Bank Stock to Exchange under terms: prohibiting encumbrances upon that stock; but, permitting Bussey to borrow $1 million on that stock pending the closing of the sale to Exchange; and, requiring the repayment of any such interim loan, the clearing of any pledge lien, and the tender of unencumbered title at the eventual closing. The closing was to be held when Exchange had

---

**3.** Plaintiffs have disputed the *bona fides* of this document but have conceded its existence and terms for the purpose of their motion for partial summary judgment.

**4.** The Britton Plaza stock was transferred the same day to Bussey as security for a $170,000 loan by him to the B–A Bank. Bussey subse-

quently called the debt and sold Britton Plaza for approximately $500,000.

**5.** Pearson apparently had transferred his "ownership" interest in the Citizens Bank Stock to Bussey and Baker at some point during the fall of 1971. However, the stock remained registered in his name.

obtained regulatory approval to buy the Citizens Bank Stock.

(12) Pursuant to that purchase agreement, on December 28 and 29, 1971, Bussey borrowed the $1 million from First National Bank of Orlando ("First National"), secured by substantially all the Citizens Bank Stock. He deposited the proceeds of that loan in the B–A Fund's account at the American Bank, from which he and Baker immediately disbursed that $1 million to Pearson.

(13) On February 28, 1972, and May 5, 1972, the *Wall Street Journal* reported that the B–A Bank claimed to own the Citizens Bank and the American Bank. The Exchange officers responsible for handling the pending purchase of the Citizens Bank Stock from Bussey and Baker read these articles.

(14) On March 6, 1972, Bussey and Pearson held a press conference with the *St. Petersburg Times* to deny the B–A Bank's then-public claim to ownership of the Citizens Bank. The Exchange officers responsible for handling the pending purchase of the Citizens Bank Stock from Bussey and Baker read the *St. Petersburg Times* account of Bussey and Pearson's denial of the B–A Bank's public claim to ownership of the Citizens Bank—and thus were aware of the claim itself.

(15) Thereafter, Exchange verified that Bussey, Pearson and Baker were the registered owners of the Citizens Bank Stock and obtained quitclaim disclaimers of any interest in that stock from Pearson, B–A Bancorp and the B–A Fund.

(16) During the period following his May 11, 1972 appointment as Provisional Liquidator of the B–A Bank, Bernard Gadd and his Florida counsel attempted, without success, to discover what disposition was to be made of the Citizens Bank Stock.·

(17) On July 17, 1972, Bussey, Pearson and Baker transferred the Citizens Bank Stock to Exchange "free and clear of all encumbrances" in exchange for $2,385,395.12. A portion of the proceeds of that purchase was simultaneously used to repay the loan balance due from Bussey to First National and clear its interim pledge lien.

(18) Bernard Gadd, then the Official Liquidator of the B–A Bank, learned of the sale to Exchange on July 18, 1972, and brought this suit on July 24, 1972.

(19) On October 21, 1974, B–A Bancorp was dissolved.

*Plaintiffs' positions.*

Plaintiffs contend that these settled facts compel the following five legal conclusions:

First. Plaintiffs claim that Bussey, Pearson and Baker were control persons of the B–A Bank and each of its subsidiaries and as such, owed fiduciary duties to the B–A Bank and its depositors.

Second. Plaintiffs urge that when Bussey and Pearson purchased the Citizens Bank Stock with B–A Bank funds, they took that stock in trust for the B–A Bank.

Third. Plaintiffs argue that the October 25, 1971 transaction was, as a matter of law, a nullity, a breach of fiduciary duty, and completely incapable of divorcing the B–A Bank from its ownership of either the B–A Fund, and the assets held under the Fund's umbrella (including the Citizens Bank Stock), or its independent beneficial ownership of the Citizens Bank Stock.

Fourth. Plaintiffs contend Bussey, Pearson and Baker were converters of the Citizens Bank Stock.

Fifth. Plaintiffs allege that Exchange was not a *bona fide purchaser* of the Citizens Bank Stock since Exchange had actual knowledge of the B–A Bank's adverse claim prior to its purchase of that stock from Bussey, Pearson and Baker.

*Defendants' positions.*

The defendants' seven arguments are legal rather than factual.

First. All defendants argue that plaintiffs have not established that B–A Bank continued to own the B–A Fund after October 25, 1971, and thus cannot now recover by reason of this Court's prior ruling in this case in *Garner v. Pearson, supra,* 374 F.Supp. at 586–87.

**Second.** Exchange urges that Bussey and Pearson did not acquire the Citizens Bank Stock as trustees for the B–A Bank, but acquired those shares as trustees only for B–A Bancorp. They argue that the B–A Bancorp Agreement defined the scope of their obligations with respect to the Citizens Bank Stock and confined the scope of those duties to B–A Bancorp exclusively. And, in any event, Exchange contends that there was no resulting trust relationship between the B–A Bank and Bussey, Pearson and Baker since: (a) the B–A Bancorp Agreement existed; and, (b) the B–A Bank provided most of the purchase funds only after Bussey and Pearson had purchased the Citizens Bank Stock.

**Third.** Exchange urges that Bussey, Pearson and Baker dealt properly with the Citizens Bank Stock according to the terms of the B–A Bancorp Agreement.

**Fourth.** In Exchange's view, the *Wall Street Journal* and *St. Petersburg Times* articles did not amount to actual notice of an adverse claim by the B–A Bank to the Citizens Bank Stock.

**Fifth.** Exchange claims that it exercised proper diligence in investigating ownership of the Citizens Bank Stock prior to purchasing that stock.

**Sixth.** Exchange claims the protection of the "shelter doctrine". Fla.Stat. § 678.301(1). Exchange contends that it purchased First National's security interest in the Citizens Bank Stock from First National "prior to and independent of" its purchase of the stock from Bussey, Pearson and Baker. In addition, Exchange claims all of the Citizens Bank Stock (and not merely an amount sufficient to secure the pledge) free of any B–A Bank claim because it argues that Bussey, Pearson and Baker are obliged to indemnify Exchange against any defect in title. Exchange contends that this indemnity is subject to a "cross-collateral clause" in Bussey's pledge agreement with First National to which Exchange claims to have succeeded by its "prior and independent" purchase of First National's loan. Thus, Exchange urges that in the event that plaintiffs prevail, Bussey, Pearson and Baker must indemnify it and that obligation is a lien on the Citizens Bank Stock senior to plaintiffs' interests in that stock.

**Seventh.** Exchange contends that the B–A Bank is estopped by its failure to block the sale of the Citizens Bank Stock to Exchange.

This Court has concluded that the undisputed facts, measured by the controlling legal principles set forth below, require the grant of plaintiffs' motion for partial summary judgment. *Bruce Construction Co. v. United States, supra,* 242 F.2d at 877.

*Bussey, Pearson and Baker controlled the B–A Bank and its subsidiaries. Thus, they owed strict fiduciary duties to the B–A Bank and its depositors.*

At least until October 25, 1971, the B–A Bank owned the B–A Fund which owned B–A Bancorp and Britton Plaza. B–A Bancorp, in turn, owned the American Bank and was to own the Citizens Bank Stock as soon as the regulatory authorities had granted approval. All of the assets were purchased with B–A Bank funds. This corporate structure was created by Bussey, Pearson and Baker, who absolutely ruled all the corporate entities and directed all the relevant transactions.[6]

▪ As control persons, Bussey, Pearson and Baker were fiduciaries. *Pepper v. Litton,* 308 U.S. 295, 310–311, 60 S.Ct. 238,

---

**6.** At times, Bussey, Pearson and Baker were shareholders of the B–A Bank. At all material times, Pearson was the president and a director of the B–A Bank. Baker was always deeply involved in B–A Bank's accounting systems and records. Bussey was at times a director of the B–A Bank. He was also the Chairman of the Board and chief executive officer of the B–A Fund. Bussey's brother was the secretary of the B–A Fund. Baker was the "statutory auditor" of the B–A Fund. Bussey, Pearson and Baker were officers and directors of B–A Bancorp, and every other person who served B–A Bancorp was an employee or associate of Bussey or Baker. Finally, every relevant transfer of funds or assets by any British-American company was directed and/or executed by Bussey, Pearson or Baker.

246–247, 84 L.Ed. 281 (1939); *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425 (1921); *Gadd v. Pearson, supra*, 351 F.Supp. at 903; *Prescott v. Kreher*, 123 So.2d 721, 727 (Fla.1960), *cert. denied*, 131 So.2d 206 (1961); *Flight Equip. & Eng'r Corp. v. Shelton*, 103 So.2d 615, 625 (Fla.1958). Bussey, Pearson and Baker owed exacting fiduciary obligations—uncompromising loyalty—to the B–A Bank and its depositors, whose funds they used to finance the entire British-American complex, as well as to the other individual corporate components of that complex. *Geddes v. Anaconda Copper Mining Co., supra*, 254 U.S. at 599, 41 S.Ct. at 212; *Tcherepnin v. Franz*, 485 F.2d 1251, 1256–1257 (7th Cir. 1973), *cert. denied sub nom. McGurran v. Ettelson*, 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974); *Bellis v. Thal*, 373 F.Supp. 120, 122–123 (E.D.Pa. 1974), *aff'd without opinion*, 510 F.2d 969 (3d Cir. 1975); *Biscayne Realty & Ins. Co. v. Ostend Realty Co.*, 148 So. 560, 565 (Fla. 1933).

■ It does not matter that Bussey, Pearson and Baker were not each B–A Bank officers or directors at all relevant times. They exercised absolute *de facto* control over the entire British-American corporate complex at all relevant times. Such actual dominion carries with it fiduciary responsibility regardless of the presence or absence of *de jure* titles. *Tcherepnin v. Franz, supra*, 485 F.2d at 1254–1255; *Third Avenue Co. v. Keely*, 149 So. 30, 31–32 (Fla.1933); *Prescott v. Kreher, supra*, 123 So.2d at 727. As stated in Florida's leading case, *Quinn v. Phipps*, 113 So. 419, 421 (Fla. 1927):

> Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. *The relation and the duties involved in it need not be legal. It may be moral, social, domestic, or merely personal.* The rule as thus stated has been repeatedly quoted with approval by this court.

> \* \* \* \* \* \*

> It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused—in which confidence has been reposed and betrayed. *The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another.* The only question is, Does such a relation in fact exist? (emphasis supplied).

■ Moreover, Pearson, as the president of the B–A Bank, had a strict fiduciary duty to the B–A Bank—a responsibility which is even more rigorous when (as here) a bank is involved. *Gadd v. Pearson, supra*, 351 F.Supp. at 903. Bussey and Baker participated with Pearson in the events in suit. Bussey and Baker are thus bound to the same severe fiduciary responsibilities to the B–A Bank as Pearson, and they are jointly and severally liable with Pearson for any breach of his fiduciary duties as president of the B–A Bank. *Bankers Life & Cas. Co. v. Kirtley*, 338 F.2d 1006, 1013 (8th Cir. 1964); *Bellis v. Thal, supra*, 373 F.Supp. at 124–125. *See also* V Scott, *The Law of Trusts*, § 506, p. 3568 (3d ed. 1967).

■ Finally, the involvement of the separate related corporations in the British-American corporate family does not absolve Bussey, Pearson or Baker from their fiduciary duties to the B–A Bank. *Fickling Properties, Inc. v. Smith*, 123 Fla. 556, 167 So. 42, 43 (1936):

> It is also the established law of this jurisdiction that a *corporate fiction may be disregarded in equity where two or more separate corporations are controlled or owned by the same individuals and are used merely as a convenience for accomplishing an unconscionable transaction* that is in the individual interest of the parties controlling both corporations,

when such individuals have so contrived to use the fiction of the presumptively separate corporate identities of the participating corporations as a means of perpetrating a fraud, or effectuating a breach of trust, to the prejudice of the complainant suing in equity for a redress of such a wrong. (emphasis supplied). *Accord, Garner v. Pearson, supra,* 374 F.Supp. at 585; *Sheldon v. Tiernan,* 200 So.2d 183, 187 (Fla.1967); *Biscayne Realty & Ins. Co. v. Ostend Realty Co., supra,* 148 So. at 564–566.

The dealings between the B–A Bank, its control persons (Bussey, Pearson and Baker) and its related companies (B–A Bancorp and the B–A Fund) must be subjected to the "rigorous scrutiny" appropriate to the fiduciary relationships involved. *Pepper v. Litton, supra,* 308 U.S. at 306, 60 S.Ct. at 245; *Geddes v. Anaconda Copper Mining Co., supra,* 254 U.S. at 599, 41 S.Ct. at 212.

■ As fiduciaries, Bussey, Pearson and Baker have the burden of proving both: (1) their good faith in dealing with the corporations they controlled; and, (2) the inherent fairness of those dealings to those corporations, their shareholders and their creditors. *Pepper v. Litton, supra,* 308 U.S. at 306–307, 60 S.Ct. 245; *Geddes v. Anaconda Copper Mining Co., supra,* 254 U.S. at 599, 41 S.Ct. at 212; *Borden v. Sinskey,* 530 F.2d 478, 495 (3d Cir. 1976); *Tcherepnin v. Franz, supra,* 485 F.2d at 1256–1257; *Bayliss v. Rood,* 424 F.2d 142, 146 (4th Cir. 1970); *Lunsford v. Haynie,* 175 F.2d 603, 606 (5th Cir. 1949); *Bellis v. Thal, supra,* 373 F.Supp. at 123; *Palmer v. Stokely,* 255 F.Supp. 674, 681 (W.D.Okla.1966); *In re Automatic Washer Co.,* 226 F.Supp. 834, 836–837 (S.D.Iowa 1964), *aff'd sub nom. Bankers Life & Cas. Co. v. Kirtley, supra.*

This standard governs the entire course of dealing between fiduciary and beneficiary. The entire course of dealing (rather than the separate related transactions) must be viewed as a whole and then measured by the actual effect of the entire scheme on the beneficiary. *Pepper v. Litton, supra,* 308 U.S. at 305, 60 S.Ct. at 244.

But when there is added the existence of a "planned and fraudulent scheme," as found by the District Court, the necessity of equitable relief against that fraud becomes insistent. *No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it.* Otherwise, the fiduciary duties of dominant or management stockholders would go for naught; exploitation would become a substitute for justice; and equity would be perverted as an instrument for approving what it was designed to thwart.

*Id.* at 312, 60 S.Ct. at 248 (emphasis supplied). *Accord, Geddes v. Anaconda Copper Mining Co., supra,* 154 U.S. at 602, 41 S.Ct. at 213; *Sheldon v. Tiernan, supra,* 200 So.2d at 187.

*In 1970, the B–A Bank became the beneficial owner of the Citizens Bank Stock, as a matter of law.*

■ The B–A Bank became the beneficial owner of the Citizens Bank Stock when Bussey, Pearson and Baker caused the B–A Bank to provide the funds for Bussey and Pearson's purchase of that stock in April, 1970.[7]

■ Whenever an officer, control person, or related corporation purchases assets

---

**7.** Bussey, Pearson and Baker caused the B–A Bank to provide every cent of the purchase price and all expenses incurred on the Citizens Bank Stock purchase ($1,771,506.67 for the purchase price itself, $162,100.00 in legal fees and commissions, and $37,946.85 in interest). Bussey funded $1 million of that purchase by causing B–A Bancorp to borrow $1 million from the Chemical Bank New York Trust Company ("Chemical") on the credit of the B–A Bank. In turn, Pearson and Baker caused the

B–A Bank to repay every cent of principal and interest due on that loan. Each month, they transferred the amount required for the Chemical loan payment from the B–A Bank, to the B–A Fund, to B–A Bancorp, and thence to Chemical ($1,037,946.85). The balance of the cost of the Citizens Bank Stock purchase was paid with funds which Bussey, Pearson or Baker transferred from the B–A Bank to the B–A Fund during the period from February through May, 1970.

with corporate funds, it holds those assets in trust for the corporation which had paid for them. And, the paying corporation is the beneficial owner of such assets.[8] *In re Lela & Co., Inc.,* 551 F.2d 399, 406 (D.C.Cir. 1977); *Borden v. Sinskey, supra,* 530 F.2d at 499; *Lunsford v. Haynie, supra,* 175 F.2d at 606–607; *Ashman v. Miller,* 101 F.2d 85, 91–92 (6th Cir. 1939); *Garner v. First Nat'l City Bank, supra,* 465 F.Supp. at 385; *Garner v. Pearson, supra,* 374 F.Supp. at 586–587; *Gadd v. Pearson, supra,* 351 F.Supp. at 903; *In re Highwood Cemetery Ass'n,* 116 F.Supp. 898, 899–900 (W.D.Pa.1953); *Feller v. McGrath,* 106 F.Supp. 147, 154–157 (W.D. Pa.1952), *aff'd sub nom. Feller v. Brownell,* 201 F.2d 670 (3d Cir.) (*per curiam*), *cert. denied,* 346 U.S. 831, 74 S.Ct. 24, 98 L.Ed. 355 (1953); *Brown v. New York Life Ins. Co.,* 58 F.Supp. 252, 258–259 (D.Ore.1944), *aff'd,* 152 F.2d 246 (9th Cir. 1945); *Tillman v. Pitt Cole Co.,* 53 So.2d 772, 776 (Fla.1951); *Quinn v. Phipps, supra,* 113 So. at 427–428; *Reaves v. Hembree,* 330 So.2d 747, 749 (Fla. Dist.Ct.App.1976), *cert. denied,* 345 So.2d 423 (Fla.1977).

Exchange argues that no trust arose out of the B–A Bank's provision of the money used to purchase the Citizens Bank Stock. That argument is premised on the existence of the B–A Bancorp Agreement and the fact that some of the B–A Bank's money was paid after the actual purchase (*i.e.* in repayment of the Chemical loan).

Plaintiffs respond that it is immaterial whether the trust is described as a resulting trust or a constructive trust and the B–A Bank is the beneficial owner of the Citizens Bank Stock in either event. This Court agrees with the plaintiffs; the B–A Bank was the beneficial owner of the Citizens Bank Stock; and Bussey and Pearson held title to that stock as trustees for the B–A Bank.

First. The trust relationship which arose when Bussey and Pearson purchased the Citizens Bank Stock with B–A Bank money was not limited to the four corners of the B–A Bancorp Agreement, which was concluded between Bussey, Pearson and B–A Bancorp and not the B–A Bank. Bussey and Pearson took the Citizens Bank Stock as trustees for the B–A Bank, which had paid for it. The provisions of the B–A Bancorp Agreement cannot erase Bussey's or Pearson's fiduciary obligations to the B–A Bank. Nor can that agreement confine their trust duties solely to B–A Bancorp or cut off the rights of the B–A Bank. The B–A Bancorp Agreement, like all of the dealings between Bussey, Pearson and Baker and the British-American companies, was not at arm's length. That agreement must be rigorously scrutinized in light of Bussey and Pearson's fiduciary relationships with the B–A Bank. Such an examination demonstrates that Bussey and Pearson have not discharged their dual burden of demonstrating both their good faith, and the inherent fairness to the B–A Bank of either the B–A Bancorp Agreement, or Bussey and Pearson's conduct under color of that agreement.

The existence of a paper obligation, such as the B–A Bancorp Agreement, cannot meet Bussey or Pearson's burdens or satisfy their fiduciary duties to the B–A Bank. *Borden v. Sinskey, supra,* 530 F.2d at 495; *Dresden v. Willock,* 518 F.2d 281, 290 (3d Cir. 1975); *Lunsford v. Haynie, supra,* 175 F.2d at 606; *Garner v. First Nat'l City Bank, supra,* 465 F.Supp. at 380–381; *Brown v. Bullock,* 194 F.Supp. 207, 229 (S.D. N.Y.), *aff'd,* 294 F.2d 415 (2d Cir. 1961).

---

**8.** Moreover, when a corporate fiduciary purchases assets in his own name but pays with corporate funds, it is not necessary to trace those trust funds to precise assets. *Tcherepnin v. Franz, supra,* 485 F.2d at 1256–1257. Such a trustee has commingled trust assets with his personal property and has the burden of disproving the use of corporate moneys for personal gain. *Tcherepnin v. Franz, supra,* 485 F.2d at 1256–1257; *Hoosier State Bank of Indiana v. Gediga,* 431 F.2d 751, 753 (7th Cir.

1970); *Brown v. New York Life Ins. Co.,* 58 F.Supp. 252, 258–259 (D.Ore.1944), *aff'd,* 152 F.2d 246 (9th Cir. 1945). And, his failure to discharge that burden also binds his transferees unless they are *bona fide* purchasers. *In re Lela & Co., Inc.,* 551 F.2d 399, 407 (D.C. Cir. 1977); *Flannery v. Flannery Bolt Co., supra,* 108 F.2d 531, 534 (3d Cir. 1939), *cert. denied,* 309 U.S. 671, 60 S.Ct. 615, 84 L.Ed. 1017 (1940); *Quinn v. Phipps, supra,* 113 So. at 428.

Moreover, Bussey and Pearson have never even discharged the paper obligations of the B–A Bancorp Agreement. Bussey did deposit the proceeds of the $1 million First National loan to the B–A Fund's account on December 31, 1971, purportedly in payment for the Citizens Bank Stock. But, he and Baker immediately paid that money out of the B–A Fund's account to Pearson. Bussey and Baker also may have repaid B–A Fund obligations to third parties after October 25, 1971, but they kept the B–A Fund which held the money which the third persons had provided to the B–A Fund in the first place, or the avails of those advances. Moving money from one pocket to another cannot discharge fiduciary duties.

Second. This case does not resemble the cases relied on by Exchange.[9] In those cases, a non-fiduciary creditor without a written security instrument sought to avoid his arm's length bargain or the parole evidence rule by trying to expand an oral security interest into a resulting trust. The principles which govern such cases are radically different from those which apply when, as in this case, the trust is based on an existing fiduciary relationship, since the form and variety of the trusts, known as *ex maleficio* or *ex delicto*, are "practically without limit." *Quinn v. Phipps, supra,* 113 So. at 428. The trust *ex maleficio* arises "wherever it is necessary for the obtaining of complete justice...." *Id. Accord, Texas Co. v. Miller,* 165 F.2d 111, 116 (5th Cir. 1947); *Strates v. Dimotsis,* 110 F.2d 374, 376 (5th Cir. 1940); *Staples v. Battisti,* 191 So.2d 583, 585 (Fla.Dist.Ct.App.1966), *cert. denied,* 196 So.2d 926 (Fla.1967); *Grapes v. Mitchell,* 159 So.2d 465, 468 (Fla.1964). *See also* 33 Fla.Jur. *Trusts* § 61; V Scott, *The Law of Trusts, supra,* at §§ 462, 508.1, pp. 3412–3413, 3579.

Third. The fact that the B–A Bank actually paid over much of the purchase money after Bussey and Pearson took formal title to the Citizens Bank Stock (by repaying the loan used to buy that stock) cannot defeat the trust. Exchange argues that a resulting trust cannot arise unless the beneficiary has paid for the trust asset prior to its purchase. However, in *Doing v. Riley,* 176 F.2d 449, 457–60 (5th Cir. 1949), such a trust was imposed on a hotel because of both the plaintiff's advance of the money used to purchase the hotel and his later payment of hotel operating expenses. And, *Feller v. McGrath, supra,* 106 F.Supp. at 150, 154, also imposed a trust on corporate stock where the beneficiary had provided operating funds after the issuance of the stock which became the trust *res*. Finally, in each case, and unlike the cases cited by Exchange, there was a pre-existing fiduciary relationship, as there was here.

The B–A Bank paid for the Citizens Bank Stock. It was the beneficial owner of that stock. Bussey, Pearson and Baker held that stock in trust for the B–A Bank.

*As a matter of law, the October 25, 1971, stock transfer is a sham and cannot divorce the B–A Bank from its ownership of the B–A Fund, including its subsidiaries and their assets, or its independent beneficial ownership of the Citizens Bank Stock.*

There is no dispute that, at all times prior to October 25, 1971, the B–A Bank owned an absolute majority of the issued and outstanding shares of the B–A Fund. Nor is it disputed that on and immediately prior to October 25, 1971, the B–A Bank owned 405,602 of the 405,608 outstanding B–A

**9.** Exchange cites: *Ducie v. Ford,* 138 U.S. 587, 11 S.Ct. 417, 34 L.Ed. 1091 (1891); *Olcott v. Bynum,* 84 U.S. 44, 21 L.Ed. 570 (1873); *Manget Bros. Inc. v. Bank of Greenwood,* 381 F.2d 91 (5th Cir. 1967); *Rosenthal v. Largo Land Co.,* 200 So. 233 (Fla.1941); *Harnish v. Peele,* 386 So.2d 8 (Fla.App.1980); *Revell v. Crews,* 97 So.2d 336 (Fla.App.1957), *Cert. denied,* 449 U.S. 590, 101 So.2d 817, 66 L.Ed.2d 762 (Fla. 1958); *Womack v. Madison Drug Co.,* 155 Fla. 335, 20 So.2d 256 (Fla.1944). In *Womack v. Madison Drug Co., supra,* 20 So.2d at 257, for example, the Supreme Court of Florida found that the facts "did not create a fiduciary relation between the parties." Similarly, in *Revell v. Crews, supra,* 97 So.2d at 339, the District Court of Appeals, in denying a resulting trust, stated, "Nor could there have been ... a constructive trust absent a fiduciary relationship or fraud or both...." Thus, it is solely the absence of a fiduciary relationship in these cases that ruled out the imposition of a trust *ex maleficio* and brought into play the technical rules urged here by Exchange.

Fund shares,[10] the remaining six qualifying shares being held by Bussey, Baker, Pearson or their associates.

Defendants contend that under *Garner v. Pearson, supra,* 374 F.Supp. at 586–587, plaintiffs cannot recover for the loss of any assets held nominally or actually by the B–A Fund or its subsidiary, B–A Bancorp, unless plaintiffs have established that the B–A Bank had continuing ownership of the B–A Fund which owned B–A Bancorp which, in defendants' view, was the sole beneficial owner of the Citizens Bank Stock.

Defendants urge that plaintiffs have not established any right to the Citizens Bank Stock. Rather, defendants argue that the B–A Bank's ownership of the B–A Fund, and the B–A Bank's derivative beneficial interest in the Citizens Bank Stock and the other assets held by the B–A Fund and B–A Bancorp,[11] ended when Pearson had the B–A Bank transfer the 405,602 B–A Fund shares to the B–A Fund on October 25, 1971.

According to the defendants, the consideration for the October 25, 1971 transfer was $6.8 million made up as follows:

—$2 million purportedly paid by the return to the B–A Bank of the stock of Britton Plaza, which the B–A Bank had purchased in 1968 and transferred to the B–A Fund in 1969 for 95,000 B–A Fund shares at $10 per share ($950,000);[12]

—$1.8 million purportedly paid by the return to the B–A Bank of the stock of Killarney, which Pearson had bought only four days earlier for $765,000 paid with B–A Bank funds; and,

—$3 million purportedly paid by a twenty-year, unsecured, non-amortizing note from the B–A Fund to the B–A Bank; *i.e.,* a note due in 1991.

As a matter of law, this Court holds that the October 25, 1971 transaction is a sham and must be disregarded. That transaction is a nullity. The B–A Bank's ownership of B–A Fund and the assets under the B–A Fund umbrella remains unaffected. *Pepper v. Litton, supra; Borden v. Sinskey, supra; Wolf v. Frank,* 477 F.2d 467 (5th Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); *Zeller v. Bogue Elec. Mfg. Corp.,* 476 F.2d 795 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Bartle v. Markson,* 299 F.Supp. 958 (N.D.N.Y.1969), *aff'd,* 423 F.2d 637 (2d Cir. 1970).

The October 25, 1971 transaction was clearly not at arm's length. Pearson was the president of the B–A Bank which owned the B–A Fund which was controlled by Bussey. Defendants have failed to meet their burden under *Pepper v. Litton, supra,* 308 U.S. at 306–307, 60 S.Ct. at 245. They have not demonstrated, or offered any evidence to demonstrate, either that: (1) this transaction was executed by Bussey, Pearson and Baker in good faith; or (2) it was inherently fair to the B–A Bank. There is no triable issue on this point.[13]

The "return" of Britton Plaza and the purported "return" of Killarney could not legally support the transfer of the B–A

---

**10.** The B–A Bank acquired these shares: (a) in exchange for assets purchased with B–A Bank funds such as Britton Plaza and the American Bank; (b) in return for cash; and, (c) when it purchased all of the publicly-held B–A Fund shares by giving the shareholders time deposit accounts at the B–A Bank, thus making these former B–A Fund shareholders depositors and beneficiaries of the B–A Bank's liquidation. Bussey, Pearson and Baker engineered all of these transactions.

**11.** These include the American Bank for which the B–A Bank had paid $1.7 million in 1969. See *Garner v. First Nat'l City Bank, supra.*

**12.** This stock was immediately taken by Bussey as security for a $170,000.00 advance to the B–A Bank and later sold by him for approximately $500,000.

**13.** Clear and convincing evidence of the fair discharge of fiduciary obligation is required. *Dresden v. Willock, supra,* 518 F.2d at 291; *Lunsford v. Haynie, supra,* 175 F.2d at 607; *Bellis v. Thal, supra,* 373 F.Supp. at 126–128, 132. Documentary evidence prevails over retrospective explanations. *Id.* And, any doubts as to the propriety of a fiduciary's arrangements with his beneficiary must be resolved in favor of the beneficiary, not the fiduciary. *Ashman v. Miller, supra,* 101 F.2d at 91.

562

Fund (and all that remained under the Fund's umbrella: the American Bank, Citizens Bank, etc.) to the absolute control of Bussey, Pearson and Baker. A transfer of corporate assets to a related entity in exchange for property at inflated values is also a nullity. *Geddes v. Anaconda Copper Mining Co., supra,* 254 U.S. at 599–602, 41 S.Ct. at 212–213; *Bankers Life & Cas. Co. v. Kirtley, supra; Bellis v. Thal, supra; Wolf v. Frank, supra; Bartle v. Markson, supra.*

■ The unsecured, $3 million, 1991 note from the B–A Fund cannot support the October 25, 1971 transaction or make it fair to the B–A Bank. An exchange of corporate assets for the unsecured long-term debt of a related party is void, as a matter of law. *Borden v. Sinskey, supra,* 530 F.2d at 496; *Wolf v. Frank, supra,* 477 F.2d at 472; *Zeller v. Bogue Elec. Mfg. Corp., supra,* 476 F.2d at 802; *Bartle v. Markson, supra,* 299 F.Supp. at 964–965.

Assuming that the October 25, 1971 transaction occurred exactly as the defendants claim, the B–A Bank did not thereby lose its ownership of the B–A Fund and all that went with that ownership. The B–A Bank remained the beneficial owner of the Citizens Bank Stock (along with the other assets under the Fund's umbrella). On the morning of October 25, 1971, the B–A Bank owned the B–A Fund and had beneficial ownership of all of the assets of the B–A Fund—the Citizens Bank, the American Bank, Britton Plaza, Killarney and the other assets it had paid for. *See Garner v. Pearson, supra,* 374 F.Supp. at 585. At the close of the day, according to defendants, the B–A Bank owned Killarney, a $3 million twenty-year non-amortizing unsecured note from the B–A Fund, and the $170,000 that Bussey had advanced in exchange for the pledge of Britton Plaza. Looking at this transaction in its entirety, as *Pepper v. Litton, supra,* requires, it must be said, as a matter of law, that the defendants have failed to raise any triable issue. Bussey, Pearson and Baker remained trustees of the Citizens Bank Stock (and the other assets) for the B–A Bank and its depositors.[14]

*Bussey, Pearson and Baker converted the Citizens Bank Stock.*

■ A control person using corporate funds to purchase assets taken in his name who purports to extinguish the beneficiary-corporation's rights in those assets by causing the corporation to waive or transfer those rights for overvalued consideration and long-term executory arrangements is a converter. *Borden v. Sinskey, supra,* 530 F.2d at 496; *Wolf v. Frank, supra; Zeller v. Bogue Elec. Mfg. Corp., supra; Ashman v. Miller, supra; Garner v. First Nat'l City Bank, supra; Bellis v. Thal, supra; Garner v. Pearson, supra; Bartle v. Markson, supra.*

■ This record requires partial summary judgment in the plaintiffs' favor and against Bussey, Pearson and Baker jointly and severally. No evidence has been offered which raises any triable issue relevant to the Citizens Bank Stock. Accepting the defendants' story as true, it remains indisputable that the B–A Bank had and retained the beneficial ownership of the Citizens Bank Stock. Bussey, Pearson and Baker sold that stock to Exchange for $2.3 million in July, 1972, in violation of the B–A Bank's rights and in disregard of their fiduciary duties. Their acts and agreements were detrimental to the B–A Bank as a matter of law. Those arrangements are void and must be set aside in favor of the B–A Bank. *Pepper v. Litton, supra; Geddes v. Anaconda Copper Mining Co., supra,* 254 U.S. at 602; *Sheldon v. Tiernan, supra,* 200 So.2d at 187. Bussey, Pearson and Baker are summarily liable to the B–A Bank and its liquidators for their conversion of the Citizens Bank Stock.

14. Subsequent rulings of the Luxembourg courts concerned with formal title to the B–A Fund shares are irrelevant. No doubt, Bussey, Pearson and Baker placed all formal indicia of title to the 405,602 B–A Fund shares in the B–A Fund as they claim. The point is that purported transfer of that stock was a nullity *ab initio.* The later handling of the formal title is therefore meaningless.

*Exchange was not a bona fide purchaser of the Citizens Bank Stock.*

■ Exchange could take no better title to the Citizens Bank Stock than Bussey, Pearson and Baker had. Fla.Stat. § 678.8–301(1). Bussey, *et al.* were converters. Exchange, then, has only the title of a converter.

■ Exchange raises the affirmative defense of *bona fide* purchase. It has the burden of proving its right to the favored status of a *bona fide* purchaser. *See, e.g., Oscar Gruss & Son v. First State Bank,* 582 F.2d 424, 433 (7th Cir. 1978); *Gutekunst v. Continental Ins. Co.,* 486 F.2d 194, 195 (2d Cir. 1973); *Garner v. First Nat'l City Bank, supra,* 465 F.Supp. at 382–85; *Morgan Guaranty Trust Co. v. Third Nat'l Bank,* 400 F.Supp. 383 (D.Mass.1975), *aff'd,* 529 F.2d 1141 (1st Cir. 1976); *Phoenix Ins. Co. v. Nat'l Bank & Trust Co.,* 366 F.Supp. 340 (M.D.Pa.1972), *aff'd without opinion,* 485 F.2d 681 (3d Cir. 1973); *Friend v. Morrow,* 558 S.W.2d 780, 784 (Mo.App.1977). *Cf. Doing v. Riley, supra,* 176 F.2d at 459; *Armenian Hotel Owners, Inc. v. Kulhanjian,* 96 So.2d 146 (Fla.1956). *See Otten v. Marasco,* 353 F.2d 563 (2d Cir. 1965); *Hartford Acc. and Indem. Co. v. Walston & Co., Inc.,* 21 N.Y.2d 219, 287 N.Y.S.2d 58, 234 N.E.2d 230 (1967); *Seymour v. McKinstry,* 106 N.Y. 230, 12 N.E. 348 (1887).

A *"bona fide* purchaser" is "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security." Fla.Stat. § 678.8–302. An "adverse claim" to a security includes any claim that a transfer was, or would be, wrongful or that a particular adverse person is the owner of, or has an interest in, the security. Fla.Stat. § 678.8–301; *Dean Witter & Co. v. Educational Computer Corp.,* 369 F.Supp. 757, 764 (E.D.Pa.1974). One has "notice" of a fact when he has actual knowledge of the fact. Fla.Stat. § 671.201(25)(a).

■ Exchange had actual notice that the B–A Bank claimed ownership of the Citizens Bank Stock before Exchange purchased that stock. Exchange is not a *bona fide* purchaser.

A February 28, 1972, *Wall Street Journal* article on the B–A Bank reported that its founders, Bussey and Pearson, controlled the American Bank and the Citizens Bank, but that the B–A Bank's then-current owner, Dr. Cruz, contended that the B–A Bank actually owned the Citizens Bank and the American Bank.[15] That article also stated that:

> Even more unsettling to Mr. Pearson was a public contention by Mr. Cruz that in buying the Nassau bank he had also acquired control of the two banks in Florida.

and that, Peter Lazaros, an associate of Cruz,

> contends that records indicate the British-American Bank owns the two Florida banks.[16]

A March 6, 1972, *St. Petersburg Times* story reported Bussey and Pearson's denial of the *Wall Street Journal* report of the B–A Bank's claims to the Citizens Bank and the American Bank:

> One point was strongly emphasized by Pearson, Bussey and Bassett: Whatever the course of the Bahamas dispute, the American National Bank in South Pasadena is not affected in any way. Neither, they said, is the Citizens Bank of Cler-

---

**15.** As to the disposition of the American Bank, see *Garner v. First Nat'l City Bank, supra,* 465 F.Supp. 372.

**16.** On May 5, 1972, the *Wall Street Journal* repeated its account of the B–A Bank's claim to the Citizens Bank and reported Bussey's denial of that claim:

> The disputed affairs of the banks [the B–A Bank and a Bahamian subsidiary] including whether they own two banks and a shopping center in Florida, were the subject of a Wall Street Journal article February 28.
>
> \* \* \* \* \* \*
>
> Messrs. Bussey and Pearson control American National Bank & Trust Co. in St. Petersburg and Citizens Bank of Clermont, Fla., near Disneyworld, with combined assets of about $60 million. Mr. Bussey protested Dr. Cruz's claim that British-American Bank owned the two Florida Banks and a nearby shopping center.

mont, which, like American National, is controlled by Bussey and has Pearson on the board of directors.

They said they had read dispatches quoting Dr. Cruz, the new chairman, as saying the British-American Bank 'controlled' the two Florida banks. 'It's not only preposterous, it's impossible under U.S. banking laws,' said Bassett. 'There's nothing for our customers to be concerned about in the least.'

The Exchange officers responsible for conducting the pending purchase of the Citizens Bank Stock from Bussey, Pearson and Baker [17] admitted that they read those articles prior to the closing of the purchase.

The February 28, 1972 front-page *Wall Street Journal* article reporting the B–A Bank claim that it owned the Citizens Bank and the March 6, 1972, *St. Petersburg Times* article reiterating that statement were adverse claims. Fla.Stat. § 678.8–301; *Dean Witter & Co. v. Educational Computer Corp., supra*, 369 F.Supp. at 764. Exchange actually knew the relevant fact— the B–A Bank claimed to be the owner of the Citizens Bank Stock. *Garner v. First Nat'l City Bank, supra*, 465 F.Supp. at 377–78, 381. The operative fact is the existence of the B–A Bank's claim and not the truth of the claim. Exchange knew of the B–A Bank's claim, but apparently chose not to believe it.[18]

As a matter of law, Exchange had actual knowledge of the adverse B–A Bank claim of ownership to the Citizens Bank Stock

before it purchased the stock from Bussey and Baker in July, 1972. *Garner v. First Nat'l City Bank, supra*, 465 F.Supp. at 377–78, 381.

■ Exchange cannot be a *bona fide* purchaser. Exchange actually knew that the B–A Bank claimed ownership of the Citizens Bank. Exchange apparently chose to disregard these claims and believe the denials of Bussey and Pearson.[19] However, actual knowledge of such an adverse claim cannot be cured or avoided by any extra-judicial investigation of the merits of the claim. Investigation of a claim actually known may (conceivably) lead one to doubt or disbelieve the merits of that claim, but such investigation cannot erase the knowledge that the claim exists and was made. One having actual knowledge of an adverse claim must defeat that claim on its merits in court before he can take free of it.

*Even if the "constructive notice" doctrine applied (and it does not) Exchange cannot be a bona fide purchaser of the Citizens Bank Stock.*

Exchange claims that the public circulation of the B–A Bank's adverse claim only put it on constructive notice—a duty of inquiry, which it claims to have reasonably discharged without coming upon actual notice of the B–A Bank's adverse claim to ownership of the Citizens Bank Stock.

■ This is not the law; there was actual notice here. However, even if Exchange were correct regarding the quality of the

---

17. The contract of sale was between Exchange and Bussey and Baker. However, approximately one-half of the shares were registered in Pearson's name and he transferred those shares to Exchange at the closing.

18. However, Exchange's own behavior confirms that it gave some credence to the B–A Bank's claim to the Citizens Bank Stock. It took defensive steps. *See* White and Summers, *Uniform Commercial Code*, p. 477 (1972). After admittedly reading the adverse claim, Exchange sought and obtained written disclaimers of interest from B–A Bancorp and the B–A Fund and a quitclaim release from Pearson. This behavior may be said to indicate serious doubt regarding the provenance of the Citizens Bank Stock.

19. Exchange seeks to claim that it was not persuaded of the credibility of the claim or the *bona fides* of the B–A Bank spokesmen and thus was not on actual notice. However, even a reasonable disbelief of the merits of a known claim cannot permit one to take free of that claim. If a known but disbelieved claim is untrue, or unfounded, then the purchaser will prevail in court on the merits of that claim. If, on the other hand, the claim is established in court, then the purchaser who takes with knowledge of that claim must take subject to that claim. The point of the *bona fide* purchase doctrine is to permit one to take free only of those valid claims of which he was ignorant—not those he chose to disbelieve.

notice, plaintiffs must still prevail. A good faith inquiry, if made, would have revealed the B–A Bank's claim. Exchange, upon learning of the B–A Bank's claim in the press, inquired of everyone except the B–A Bank regarding that claim.[20] Had Exchange asked the B–A Bank, it would have learned of the adverse claim. Apart from Cruz, Exchange could have asked Bernard Gadd, who had been appointed as Provisional Liquidator of the B–A Bank in May, 1972, and was actively seeking to learn what disposition was being made of the Citizens Bank Stock. It could have looked at the most recent B–A Bank financial statement which, although uncertified, stated the claim. Exchange's constructive notice argument thus fails as a matter of law.

One has "constructive notice" of a fact when from all the facts and circumstances known to him at the relevant time he has reason to know that it exists. Fla. Stat. § 671.201(25). A person has "reason to know" a fact when he has such information as would prompt a person exercising reasonable care to acquire knowledge of the fact in question. *Zdunek v. Thomas*, 254 N.W. 382 (Wis.1934).[21]

Exchange had at least constructive notice of the B–A Bank's adverse claim to ownership of the Citizens Bank Stock, and upon rational inquiry would have had obtained absolute knowledge of that claim. Had it inquired of the B–A Bank, consulted the B–A Bank's records, or asked the Provisional Liquidator, Exchange would have been advised of the B–A Bank's claim. Exchange must be deemed to have had "notice" of the B–A Bank's claim. Thus, Exchange cannot have the favored status of a *bona fide* purchaser in any event. *Miriani v. Rodman and Renshaw, Inc., supra*, 358 F.Supp. at 1014; *Garner v. First Nat'l City Bank, supra*, 465 F.Supp. at 382–383. Exchange did not take the Citizens Bank Stock in "good faith". *Garner v. First Nat'l City Bank, supra*.

*The "shelter doctrine" does not insulate Exchange.*

Exchange did not purchase any of the Citizens Bank Stock from First National. It purchased that stock from Bussey, Pearson and Baker. Exchange succeeded only to the non-existent ownership rights of Bussey, Pearson and Baker, and not to any rights that First National might have had.[22]

---

**20.** Exchange's failure to make inquiry of the B–A Bank might evidence a belief or fear that honest investigation might disclose the vice in the transaction. Cf. *First National Bank of Blairstown v. Goldberg*, 340 Pa. 337, 17 A.2d 377 (1941). A failure to make reasonable inquiry is more significant in a case where the purchaser is a commercially sophisticated bank. *S.E.C. v. Investors Security Corp.*, 415 F.Supp. 745 (W.D.Pa.1976); aff'd in pert. part, 560 F.2d 561 (3d Cir. 1977).

**21.** One put on inquiry of a fact must make that inquiry from a reliable source from whom the true state of facts would be naturally disclosed. A potential creditor cannot defeat a prior security interest merely by relying upon the uncorroborated assurances of his potential debtor. *Community Bank v. Jones*, 278 Or. 647, 566 P.2d 470 (Ore.1977). It is not sufficient for a purchaser to restrict his inquiry to his seller. The purchaser knows it is in the seller's best interest to misrepresent or conceal the existence of any adverse claim. This is particularly true where the purchaser has reason to believe that the seller offering property for sale is holding that property as a trustee for a third person. "In such a case, inquiry must be made of someone other than the agent or trustee,—of someone who will have a motive to tell the truth...." *United States v. Bennett*, 57 F.Supp. 670, 679 (E.D.Wash.1944). Here, of course, Exchange knew that Bussey, Pearson and Baker controlled B–A Bancorp and held the stock for B–A Bancorp. Similarly, Exchange cannot rely on whatever investigation may have been made by First National. *Miriani v. Rodman & Renshaw, Inc.*, 358 F.Supp. 1011 (N.D.Ill.1973).

**22.** The purchase agreement between Exchange and Bussey and Baker permitted a "bridge" loan secured by the Citizens Bank Stock, pending the closing of the Exchange purchase of that stock. That agreement prohibited all liens or encumbrances apart from that "bridge" loan. It required satisfaction of the "bridge" loan by Bussey and Baker at the closing, and out of the proceeds of the sale to Exchange. In turn, the "bridge" loan documents prohibited any sale of the collateral without repayment of the loan—otherwise such a sale would result in a default on the note and a First National foreclosure.

On Monday, July 17, 1972, Bussey, Pearson and Baker closed the sale of the Citizens Bank Stock to Exchange.[23] First National did not transfer any of the Citizens Bank Stock to Exchange. Bussey, Pearson and Baker each executed new stock powers that day transferring the Citizens Bank Stock from them to Exchange. They executed other documents transferring all of the stock from them (not First National) to Exchange for $2.3 million, free and clear of all liens and encumbrances. Bussey, Pearson and Baker did not transfer their equity of redemption subject to the lien of First National or to an assignee of First National in exchange for $1.35 million ($2.3 million less the $950,000 due First National).

Bussey, Pearson and Baker purported to sell, and Exchange purported to buy, full, free and clear, marketable title as required in the purchase agreement and as provided in all the closing documents. Exchange did not purchase their rights subject to an existing lien of First National. The principal and interest due on the First National "bridge" loan were paid over from Exchange to First National and credited to the purchase price to ensure that the lien was cleared as required.[24]

■ Had First National or any assignee of its note sold the pledged stock at public sale in order to collect its loan after default, any purchaser would fit under the "shelter doctrine"—that would be necessary to protect First National's status as a *bona fide* purchaser (if it had that status). However, the "bridge" loan was not in default when Exchange bought the stock from Bussey, *et al.* First National did not need to sell title

to its collateral free and clear of adverse interests in order to reap the benefits of any status it may have enjoyed as a *bona fide* purchaser. In this case, an expansion of the "shelter doctrine" to shield Exchange is not necessary to protect any legitimate interest First National may have had as a *bona fide* purchaser. Indeed, such an expansion would distort the transaction and pervert the purpose of the "shelter doctrine" to the detriment of the only truly innocent parties in the case—the B–A Bank and its depositors.

Exchange bought the Citizens Bank Stock from Bussey, Pearson and Baker, not from First National. Exchange did not succeed to any right or interest of First National. The "shelter doctrine" is inapposite.

*Plaintiffs are not estopped.*

■ Exchange cannot claim an estoppel based on B–A Bank silence. Exchange had both actual knowledge of the fact that the B–A Bank claimed ownership to the Citizens Bank Stock and the means of acquiring such knowledge. *Ennis v. Warm Mineral Springs, Inc.*, 203 So.2d 514, 520 (Fla. App.1967), *cert. denied*, 210 So.2d 870 (1968); 31 C.J.S. *Estoppel* § 87 (1964).

■ Silence cannot support an estoppel unless the person claiming an estoppel can prove that: (1) he justifiably relied on the silence to his detriment; and, (2) such reliance was intended or reasonably anticipated by the one who remained silent. *Ennis v. Warm Mineral Springs, Inc., supra*, 203 So.2d at 520; *Davis v. Evans*, 132 So.2d 476, 481 (Fla.Dist.Ct.App.), *cert. denied*, 136

---

**23.** On July 14, 1972, the Friday prior to the closing of Exchange's purchase from Bussey, Pearson and Baker, First National delivered to Exchange's counsel, the note, the hypothecation agreement, assignments of these documents, the Citizens Bank Stock endorsed in blank by Bussey and Pearson and a sight draft in the amount which would be due on the "bridge" loan on July 17, 1972—the date of the closing of Exchange's purchase from Bussey and Baker. These documents were delivered in escrow pending Exchange's July 17, 1972 remittance of good funds sufficient to retire the loan. Those funds were to be (and were) paid at the closing of the sale of the Citizens Bank

Stock to Exchange. This escrow delivery was not a separate and "prior" assignment to Exchange "independent" of the July 17, 1972 sale by Bussey, Pearson and Baker. The stock powers sent by First National were not used to transfer the Citizens Bank Stock to Exchange.

**24.** Sale without clearing of the lien would have violated the purchase agreement between Exchange and Bussey and Baker. It would also have caused a default under the First National loan provisions which prohibited a sale to Exchange so long as the loan remained outstanding.

So.2d 348 (1961); *Steen v. Scott*, 144 Fla. 702, 198 So. 489, 493 (1940). Of course, the burden of proving the estoppel rests upon the party invoking it. *Ennis v. Warm Mineral Springs, Inc., supra*, 203 So.2d at 519; *Connelly v. Special Road & Bridge Dist. No. 5*, 99 Fla. 456, 126 So. 794 (1930).

In this case, Exchange knew the truth (the B–A Bank had claimed ownership); it was not misled. In any event, it could not disregard the readily accessible source of information regarding the adverse claim (*i.e.* the B–A Bank) and still claim to rely on the silence of the B–A Bank. Silence could not have been intended (and did not operate) to induce Exchange to refrain from investigating the public B–A Bank claim.

The B–A Bank learned of the sale to Exchange on July 18, 1972. It commenced this suit on July 24, 1972. In contrast, Exchange knew of the B–A Bank's claim for four months prior to closing. Therefore, it is impossible for this Court to hold that the B–A Bank was silent or that it intended to encourage Exchange to consummate the purchase of the Citizens Bank Stock. Exchange has no support for its estoppel claim.

The B–A Bank's diligence in bringing this action after learning of the sale of the Citizens Bank Stock to Exchange negates any possibility of laches in this case. *Borden v. Sinskey, supra*, 530 F.2d at 487–88.

### *Conclusion*

In summary, the Court holds as follows:

(1) The October 25, 1971 transaction is a nullity.

(2) The B–A Bank was the beneficial owner of the Citizens Bank Stock.

(3) Bussey, Pearson and Baker converted the Citizens Bank Stock to their own use.

(4) Exchange purchased the Citizens Bank Stock with actual knowledge of B–A Bank's adverse claim to that stock.

(5) Exchange purchased the Citizens Bank Stock from the converters subject to the B–A Bank's superior claim to ownership of that stock.

(6) Exchange cannot avail itself of the "shelter doctrine".

(7) Plaintiffs are not estopped.

(8) The plaintiffs are entitled to the entry of a judgment against all defendants for the value of the Citizens Bank Stock or its proceeds.

### ON PROPOSED JUDGMENT

By Memorandum Opinion entered March 15, 1982 I found that defendants Bussey, Pearson and Baker converted certain Citizens Bank Stock of which British-American Bank was the beneficial owner and that defendant Exchange Bancorporation had purchased the Citizens Bank Stock from the converters with actual knowledge of British-American's adverse claim thereto. I concluded that plaintiffs were entitled to the entry of a judgment "against all the defendants for the value of the Citizens Bank Stock or its proceeds."

On May 26, 1982 I entered judgment against Pearson, Baker and Robert N. Bussey for $2,385,395.12 plus interest, making a total of $3,899,153.78.

Plaintiffs submitted on May 7, 1982 a proposed judgment against Exchange as follows:

| | |
|---|---:|
| (1) the value of the Trust Shares on July 17, 1972, | $2,385,395.12 |
| (2) the amount of the retained earnings attributable to the Trust Shares as at December 31, 1981, | $ 731,975.68 |
| (3) the aggregate amount of the dividends attributable to the Trust Shares, | $ 967,580.00 |
| (4) the aggregate interest on the dividends attributable to the Trust Shares from December 31 of the year of payment to December 31, 1981, | $ 193,079.83 |
| (5) accrued interest on the dividends attributable to the Trust Shares from December 31, 1981 to the date of entry of judgment at the daily increment of $159.06, | $ |
| (6) accrued interest on the retained earnings attributable to the Trust Shares from December 31, 1981 to the date of entry of judgment at the daily rate of $120.32, | $ |
| TOTAL | $ |

The proposed judgment was accompanied by a memorandum in support thereof and an application for judicial notice pursuant to Federal Rule of Evidence 201. The application related to certain source documents relied upon in computing the alleged retained earnings and dividends attributable to the Citizens Bank Stock.

Responsive to Rule 201(e), Fed.R.Evid., I noticed a hearing as to the proposed judgment against Exchange.

On June 1, 1982 defendant Exchange filed a "Response to Plaintiffs' Memorandum on Proposed Judgment."

At hearing on June 24, 1982 plaintiffs filed a memorandum replying to the response of defendant Exchange and an affidavit in support of an amended proposed judgment.

At hearing counsel for defendant Exchange, without agreeing to the entry thereof, offered no objection to method of computation of the judgment against Pearson, Baker and Robert N. Bussey, and without agreeing to the need thereof offered no objection to the propriety of taking judicial notice or the tenor of the matter sought to be noticed. He did object to the use of any measure of damages which would result in a judgment against Exchange in an amount greater than the judgment against Pearson, Baker and Robert N. Bussey and requested an opportunity to be heard in the event the Court should consider plaintiffs' affidavit in support of amended proposed judgment filed June 22.

I have reconsidered the file and all memoranda and submissions except for plaintiffs' June 22 affidavit in support of amended proposed judgment.

In his memorandum supporting proposed judgment filed May 7, 1982 plaintiff claims that Exchange is liable to plaintiffs as a constructive trustee of the Citizens Bank Stock and says of its proposed judgment:

"This constructive trust measure of damages conforms to the pleadings, this Court's holding in *Garner v. Pearson, supra*, the opinion in *Garner v. First National City Bank*, 465 F.Supp. 372, 385 (S.D.N.Y.1979) and the general law of trust recovery. See IV Scott, *The Law of Trusts* § 291.02 (1967); V Scott, *The Law of Trusts*, §§ 462.2, 495 (1967); Restatement (Second) of Trusts §§ 291, 297 (1959)."

Defendant Exchange does not admit liability but agrees that if liable, it is as a constructive trustee.

I have not heretofore addressed the issue as to the measure of damages against Exchange in this case.

In an opinion in this case *Garner v. Pearson*, 374 F.Supp. at 580, 586 (1973) I held the appropriate remedy to be that of a constructive trust.

In my March 15, 1982 opinion I found plaintiffs to be entitled to a judgment *against all* defendants for the value of the Citizens Bank Stock *or its proceeds.* (emphasis supplied).

The parties agree that it would be impractical to order a return of the Citizens Bank Stock itself and seem to agree that, if anything, "the proceeds" should be recovered as damages. The issue of course is what is "the proceeds." This is a diversity case in which the law of Florida applies. In determining the status of Exchange at the time it acquired the Citizens stock Florida statutory and case law was applied. Simply stated, Florida trust law follows the general law to the effect that ". . . wrongful conversion gives rise to a constructive trust that pursues the property, its product or its proceeds." Section 72, Trusts, 33 Fla.Jur. 75.

Both plaintiffs and defendants cite *Garner v. First National City Bank*, 465 F.Supp. 372 (S.D.N.Y.1979). It involved somewhat similar events and some of the same parties as does the case before this Court. There, at pages 384 and 385 under a section on damages the court discussed "a conversion measure of damages" and "a constructive trust theory of damages."

In his discussion of a "conversion measure of damages" he referred to the case of *Mayer, et al. v. Monzo*, 221 N.Y. 442, 117 N.E. 948, a 1917 New York case. I find no

Florida case, and none has been cited, holding or even discussing any theory of damages called "conversion measure of damages." In any event for reasons given the New York district judge refused to do other than apply what he referred to as a constructive trust theory of damages, and even if there was in Florida a conversion measure of damages, I would refuse to apply it in this case.

I have never held and do not hold that Exchange or any of its officers were guilty of any fraud, abuse of duty or wrongful or illegal conduct. I have held that it and they purchased the Citizens Bank Stock with actual knowledge of British-American's adverse claim to the stock to the extent and under circumstances which prevented it from being a bona fide purchaser.

I have noted the sections of Scott "The Law of Trusts" and the reference thereto in footnote 19 at page 385 of *Garner v. First National City Bank, supra,* and for the reasons given find them inapplicable here.

I find that the entry of a judgment in favor of plaintiffs and against Exchange in the principal amount of $2,385,395.12 plus interest thereon to be in accord with the law and just and equitable.

Judgment will be entered.

### ON RECONSIDERATION

On June 30, 1982 I entered partial summary judgment in this cause against defendant Exchange Bancorporation, Inc. On July 9, 1982 plaintiffs filed a motion under Rule 59, Fed.R.Civ.P. for reconsideration of the Court's memorandum opinion entered June 30, 1982 and alternatively, for correction of the June 30, 1982 judgment.

On July 9, 1982 defendant Exchange Bancorporation, Inc. filed a motion for correction of clerical error or, alternatively, to amend the June 30 judgment and a motion to stay execution of judgment.

Upon consideration, plaintiffs' motion for reconsideration of the Court's June 30, 1982 memorandum opinion is GRANTED and upon reconsideration, said memorandum opinion is CONFIRMED. Upon considera-

tion of plaintiffs' motion for correction of the June 30, 1982 judgment and defendant Exchange Bancorporation's motion for correction or amendment of said judgment, both said motions are GRANTED. It seems clear that the interest provided in said judgment should have been calculated from July 17, 1972 rather than October 25, 1971. A corrected and amended judgment reflecting this change and the change resulting from the daily accrual of interest to the date of entry of judgment will be separately entered concurrently herewith.

In its motion to stay execution of judgment defendant Exchange Bancorporation, Inc. indicates that it intends to supersede the judgment and perfect an appeal and requests that execution of the judgment be stayed for a period of thirty days to allow that to be done. Said motion is GRANTED and execution of the June 30, 1982 judgment as corrected and amended concurrently herewith is STAYED for a period of thirty days from the date of this order.